The TIMKEN COMPANY, Plaintiff,

v.

UNITED STATES, Defendant,

NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation; Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; NSK Ltd. and NSK Corporation, Defendant–Intervenors.

Slip Op. 96–86.
Court No. 94–01–00008.

United States Court of International Trade.

May 31, 1996.

Stewart & Stewart (Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, John M. Breen, Lane S. Hurewitz and Patrick J. McDonough), Washington, DC, for plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael S. Kane); of counsel: Linda Chang, Attorney–Advisor, United States Department of Commerce, for defendant.

Barnes, Richardson & Colburn (Donald J. Unger and Jesse M. Gerson), Chicago, IL, for defendant-intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Susan P. Strommer and Elizabeth C. Hafner), Washington, DC, for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson), Washington, DC, for defendant-intervenors NSK Ltd. and NSK Corporation.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Timken Company ("Timken"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of administrative reviews entitled *Final Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan* ("*Final Results*"), 58 Fed.Reg. 64,720 (1993).

### Background

On November 22, 1991, Commerce initiated administrative reviews of tapered roller bearings ("TRBs") from Japan covering the period of 1990 to 1991. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 58,878 (1991). On November 27, 1992, Commerce initiated administrative reviews of TRBs imported from Japan during the period of 1991 to 1992. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 57 Fed.Reg. 56,318 (1992). Commerce published the preliminary results of both reviews on September 30, 1993. *See Preliminary Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan,* 58 Fed.Reg. 51,058 (1993).

On December 9, 1993, Commerce published its final determinations concerning these reviews. *See Final Results,* 58 Fed.Reg. at

64,720. Timken now moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record alleging the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) including below-cost sales in its calculation of profit for purposes of determining constructed value; (2) applying two different methodologies for the assessment of antidumping duties and for the establishment of future cash deposit rates; (3) adding an insufficient value-added tax ("VAT") to home market prices in calculating foreign market value ("FMV"); (4) adjusting FMV for pre-sale inland freight expenses; (5) accepting NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation's (collectively "NTN") allocation of expenses; (6) allowing adjustments to NTN's U.S. price calculated on the basis of transfer prices; (7) allowing unsubstantiated adjustments to NTN's U.S. indirect selling expenses; (8) committing certain methodological errors with respect to NTN; (9) allowing home market billing adjustments based on both in-scope and out-of-scope sales of Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"); (10) accepting NSK Ltd. and NSK Corporation's (collectively "NSK") post-sale price adjustments; (11) refusing to apply results of a verification proceeding retroactively; and (12) committing various clerical errors.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59

S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

1. *Use of Below–Cost Sales for Calculation of Profit*

 Timken contends that Commerce erred by including below-cost sales in its calculations of profit for use in constructed value. According to Timken, the statute requires Commerce to exclude below-cost sales from its calculation of profit. Pl.'s Mem.Supp.Mot.J.Agency R. at 28–30 (citing 19 U.S.C. § 1677b (1988)). Timken emphasizes that below-cost sales are excluded from the calculation of FMV in certain situations pursuant to 19 U.S.C. § 1677b(b) (1988). Pl.'s Mem.Supp.Mot.J.Agency R. at 28. Timken further argues that below-cost sales are outside the ordinary course of trade. *Id.* at 30–31.

Commerce defends its decision to include below-cost sales in its calculations of profit by asserting that there are separate and distinct methodologies for determining constructed value and FMV based on price. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 15–17. Commerce asserts that 19 U.S.C. § 1677b(e)(1)(B) specifically requires constructed value to be calculated based upon the "overall profit experience" of merchandise of the same general class or kind. *Id.* at 16–17. Commerce also disagrees with Timken's characterization of below-cost sales as being outside the ordinary course of trade. According to Commerce, the statutory definition of "ordinary course of trade" does not exclude below-cost sales. *Id.* at 18–21 (citing 19 U.S.C. § 1677(15) (1988)).

This Court has already determined that 19 U.S.C. § 1677b does not require the exclusion of below-cost sales when determining the profit amount in calculating constructed value.[1] *Federal–Mogul Corp. v. United States,* 20 CIT ——, ——, 918 F.Supp. 386,

---

1. The relevant portions of 19 U.S.C. § 1677b

governing the determination of FMV and the use

402–03 (1996); *Torrington Co. v. United States,* 19 CIT ——, ——, 881 F.Supp. 622, 633 (1995). In order for below-cost sales to be excluded, it must be demonstrated that the sales were made outside the ordinary course of trade.[2] *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 403; *Torrington,* 19 CIT at ——, 881 F.Supp. at 633. In *Torrington,* 19 CIT at ——, 881 F.Supp. at 633, the Court noted that Commerce's determination of whether an importer's sales are in the ordinary course of trade is entitled to deference and that the plaintiff bears the burden of demonstrating that the sales Commerce included in its FMV calculation were outside the ordinary course of trade. The Court concluded that "[t]he statutory language and structure support Commerce's determination that below-cost sales are not automatically excluded from the calculation of profit in determining constructed value." *Id.* Thus, because Timken has failed to present any evidence in this case that the below-cost sales at issue were outside the ordinary course of trade, this Court finds Commerce's inclusion of the below-cost sales in its calculation of profit for constructed value to be reasonable and in accordance with law.

### 2. *Calculation of Cash Deposit Rates*

■ In this review, Commerce calculated cash deposit rates on the basis of U.S. price as opposed to entered value. *Final Results,* 58 Fed.Reg. at 64,731. Timken takes issue with Commerce's chosen methodology arguing that the assessment rate must equal the deposit rate in order for the correct amount of antidumping duties to be collected. Pl.'s Mem.Supp.Mot.J.Agency R. at 37–38. Timken asserts that Commerce's approach results in the undercollection of antidumping duties. *Id.* at 38–41.

Commerce responds that because the statute does not specify the manner in which Commerce must calculate deposits of estimated duties, Commerce has broad discretion in selecting a methodology. Commerce explains that it has exercised its discretion by basing deposit rates upon weighted-average dumping margins determined by dividing the aggregate dumping margins by the aggregate U.S. price. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 22–23.

The Court of Appeals for the Federal Circuit ("CAFC") recently addressed this issue in *Torrington Co. v. United States,* 44 F.3d 1572, 1578–79 (Fed.Cir.1995). The CAFC held that Commerce did not err by basing cash deposit rates on U.S. price instead of entered value data. *Id.* at 1579. In upholding Commerce's methodology, the court not-

of constructed value are as follows:

(a) **Determination; fictitious market; sales agencies**
For purposes of this subtitle—
(1) **In general**
The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person ...
(A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and *in the ordinary course of trade* for home consumption. . . .
. . . .
(e) **Constructed value**
(1) **Determination**
For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—
(A) the cost of materials ... and of fabrication or other processing of any kind employed in producing such or similar mer-

chandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of that particular merchandise in the ordinary course of business;
(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that—
. . . .
(ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost.
(Emphasis added).

2. The statute defines the term "ordinary course of trade" as "the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15).

ed that the use of U.S. price instead of entered value to calculate cash deposit rates does not result in the consistent undercollection of estimated antidumping duties. *Id.* The court further stated that "[n]o evidence compels this court to find that deriving cash deposit rates from entered values leads to a more accurate estimation of future duties than reliance on total United States price." *Id.* In light of this decision by the CAFC, the Court finds Commerce's method of calculating cash deposit rates to be consistent with law.

### 3. Calculation of Value–Added Tax Adjustment

■ Timken contends that Commerce improperly calculated the adjustment for VAT to U.S. price by adding to the U.S. price the actual amount of tax calculated for the home market comparison model. Pl.'s Mem.Supp.Mot.J.Agency R. at 44–45. In its brief, Commerce agreed that a remand was appropriate for Commerce to apply a new methodology. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 31–32.

In *Federal–Mogul Corp. v. United States,* 63 F.3d 1572 (Fed.Cir.1995), the CAFC upheld Commerce's tax-neutral methodology. Specifically, the CAFC stated the following:

> [I]n administering the Act, the Agency over the years has pursued a policy of attempting to make the tax adjustment called for by the Act tax-neutral. We conclude that Commerce's long-standing policy of attempting tax-neutrality in its administration of this provision is not precluded by the language of § 1677a, nor do we find the particular proposed methodology to be an unreasonable way to pursue that policy in light of the statutory language.

*Federal–Mogul,* 63 F.3d at 1580. In light of the decision of the CAFC in *Federal–Mogul,* the Court finds that a remand for Commerce to apply a new methodology is unnecessary. Commerce's approach of adding to U.S. price the amount of tax paid on home market sales is in accordance with the decision of the CAFC in *Federal–Mogul* and, therefore, sustained.

### 4. Pre–Sale Inland Freight Expenses

■ Timken objects to Commerce's adjustments to FMV for pre-sale inland freight expenses where respondents failed to demonstrate that the expenses were directly related to particular sales. Timken contends that Commerce's actions were inconsistent with the decision of the CAFC in *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398 (Fed.Cir.1994), *reh'g, en banc, denied,* 1994 U.S.App. LEXIS 16258 (Fed.Cir. March 1, 1994), *and cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994). Pl.'s Mem.Supp.Mot.J.Agency R. at 46–51.

·Commerce agrees that a remand is necessary due to the decision of the CAFC in *Ad Hoc.* Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 32. Commerce maintains, however, that the decision in *Ad Hoc* does not preclude all deductions for pre-sale home market inland freight expenses. According to Commerce, the statutory framework affords Commerce broad discretion to determine whether expenses are necessary to selling merchandise in the home market. Commerce further explains that its regulations permit it to adjust FMV for home market movement expenses in certain circumstances. *Id.* at 33–34. Commerce concludes that a remand is appropriate for Commerce to revise its approach on this issue to the extent necessary to conform to the decision in *Ad Hoc. Id.* at 34–35.

Defendant-intervenors disagree with Timken and Commerce arguing that a remand is not necessary since the decision in *Ad Hoc* only limits deductions from FMV for pre-sale home market transportation costs in purchase price situations. *See, e.g.,* Def.–Int. Koyo's Opp'n to Pl.'s Mot.J.Agency R. at 26–30.

Timken responds that a remand is necessary to remove any adjustment for pre-sale inland freight expenses regardless of whether FMV is compared to purchase price or exporter's sale price ("ESP") sales. Pl.'s Reply to Opp'n to Pl.'s Mot.J.Agency R. at 23–26.

In *Torrington Co. v. United States,* 68 F.3d 1347, 1352–56 (Fed.Cir.1995), the CAFC limited the application of *Ad Hoc* to situa-

tions in which U.S. price is calculated based on purchase price as opposed to ESP. The Court specifically held that Commerce may deduct indirect selling expenses, including pre-sale transportation expenses, from FMV pursuant to the ESP offset permitted by 19 C.F.R. § 353.56(b)(2).[3] *Id. See also Federal–Mogul*, 20 CIT at ——, 918 F.Supp. at 405. Thus, Commerce may deduct pre-sale inland freight expenses from FMV when U.S. price is calculated on the basis of ESP. As it is not clear to this Court whether FMV was calculated in this case using purchase price or ESP, the Court remands this issue to Commerce to deny the adjustment to FMV for pre-sale home market transportation expenses only where FMV was calculated using purchase price.

### 5. NTN's Allocation of Expenses

■ In this review, Commerce accepted NTN's allocation of various home market and indirect selling expenses based on levels of trade. *Final Results*, 58 Fed.Reg. at 64,725. In dismissing the objections of Timken at the administrative level, Commerce stated:

> We verified NTN's allocation methodology in the past and most recently for the 1991–92 review, and we are satisfied that NTN's allocations of various home market and U.S. indirect selling expenses are non-distortive and accurate. Furthermore, in our verification of NTN's 1991–92 data we specifically asked NTN to conduct a test comparing the results of its allocation based on number of invoices to the results of allocation based on sales value and we found only a negligible difference. As a result, we have accepted NTN's allocation methodology for these final results.

*Id.* (citation omitted).

Timken claims that NTN failed to demonstrate that NTN's reporting methodology bore any relationship to the manner in which the expenses were actually incurred. Timken emphasizes that adjustments to FMV must be based on actual expenses as opposed to mere approximations or averages. Pl.'s Mem.Supp.Mot.J.Agency R. at 66. According to Timken, Commerce never verified the accuracy of NTN's methodology but, rather, "merely tested its arithmetic." *Id.* Timken maintains that NTN's approach was "exceedingly complex" and produced distortive results. *Id.* at 67. In support of its argument that Commerce was not justified in accepting NTN's unique approach, Timken contrasts NTN's methodology to that of other respondents who allocated total U.S. selling, general and administrative expenses over total U.S. sales value. *Id.* at 67–71. Timken also points out that Commerce rejected NTN's use of the same methodology in a prior antifriction bearings review. *Id.* at 74–75 (referring to *Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order*, 58 Fed.Reg. 39,729, 39,750 (1993)).

Timken specifically objects to NTN's reporting of home market selling expense data which were allocated to individual levels of trade based on number of invoices. Timken insists that this approach fails to meet the requirement that expenses be reasonably related to the sales under consideration. According to Timken, a demonstration that expenses vary among levels of trade is a prerequisite to the allocation of expenses based on sales at individual levels of trade. Similarly, Timken suggests that the allocation of expenses based on "number of invoices" is likely to produce inaccurate results. Pl.'s Mem.Supp.Mot.J.Agency R. at 71–74.

Timken also argues that even if NTN properly based its expenses on level of trade, Commerce erroneously relied upon the verification report finding that NTN's use of number of invoices was reasonable. According to Timken, no record evidence existed to support the initial allocation of selling expenses to individual levels of trade based on number of invoices or relative sales value and, thus, the fact that invoices and sales value roughly correlated is irrelevant. *Id.* at 76–77.

**3.** 19 C.F.R. § 353.56(b)(2) (1993) permits Commerce to deduct indirect selling expenses from FMV as follows:

> In comparisons with exporter's sales price, the Secretary will make a reasonable deduction from foreign market value for all expenses ... incurred in selling such or similar merchandise up to the amount of the expenses ... incurred in selling the merchandise.

Finally, Timken submits that Commerce's allowance of an adjustment to U.S. price for differences in levels of trade resulted in the double counting of level-of-trade differences because Commerce also permitted a level-of-trade adjustment based on indirect selling expenses. *Id.* at 77–78.

Commerce disagrees with Timken's premise that sales value is the only reasonable basis for allocating expenses. Commerce explains that NTN's methodology is more accurate and provides a more reasonable basis for correlating expenses to the sales under consideration than the technique used by other respondents. Commerce also emphasizes that the statute is silent with respect to Commerce's choice of methodology for allocating expenses between transactions. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 37–45.

Commerce also responds to Timken's concern about number of invoices by stating there is a common sense correlation between number of invoices, sales activity and, therefore, sales expenses. In addition, based on the specific facts of this case, Commerce contends that the number of invoices served as a reasonable proxy for sales value. *Id.* at 46–47.

Commerce further maintains that NTN did not receive a redundant level-of-trade adjustment because the purpose of a level-of-trade adjustment is to adjust for a difference between United States sales and home market sales caused by different levels of trade, while the purpose of NTN's allocation methodology is to allocate expenses among individual home market and United States transactions. Finally, Commerce explains that the level-of-trade adjustment was based on indirect selling expenses while the allocated expenses were general, administrative and home market indirect expenses that were not selling expenses. *Id.* at 47–48.

Defendant-intervenor NTN supports Commerce's position arguing that the allocation methodology used by NTN does not conflict with any statutory or regulatory requirements. Def.–Int. NTN's Opp'n to Pl.'s Mot.J.Agency R. at 21. NTN also stresses

that the allocation methodology is based on specific accounting and sales records and, therefore, does not produce distortive results. *Id.* at 23–24.

Title 19, Section 1677b(a)(4), United States Code (1988), permits Commerce to adjust foreign market value if "it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to" differences in circumstances of sale. The statute has been interpreted to grant Commerce broad discretion in determining whether an importer is entitled to an adjustment to FMV. *See Smith–Corona Group v. United States,* 713 F.2d 1568, 1575 (Fed.Cir. 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Commerce's discretion is not without limits, however, as the statute requires a direct relationship between the expenses and the relevant sales. *See Smith–Corona Group,* 713 F.2d at 1580.

Timken's primary concern is NTN's decision to allocate selling expenses according to level of trade. The issue, therefore, is whether the reported expenses demonstrably vary according to levels of trade. This Court has upheld Commerce's decision in a prior review of antifriction bearings to deny NTN an adjustment for selling expenses which were allocated on the basis of level of trade where Commerce found the expenses did not vary according to level of trade. *NTN Bearing Corp. of Am. v. United States,* 19 CIT ——, ——, 905 F.Supp. 1083, 1094–95 (1995). In reaching its decision, the Court found that NTN's methodology was flawed because of its failure to quantify the expenses incurred at each level of trade. *Id.* In comparing the worksheets submitted in the present case by NTN to the evidence provided by NTN in the antifriction bearings case, this Court is unable to find any significant distinctions.[4] *See* Questionnaire Response of NTN, Exhibit B–8, C.R. Document No. 8, Worksheet Nos. 4 and 5, Fiche 179, Frames 3–5; C.R. Document No. 8, Worksheet Nos. 7 and 8, Fiche 179, Frames 7–8. Commerce has failed to

---

4. The confidential version of the administrative record is designated "C.R." The public version is designated "P.R."

locate for the Court any evidence of NTN's alleged "new recordkeeping system." Further, Commerce attempts to distinguish this case from the antifriction bearings case by stating that in the TRB reviews it determined that NTN had in fact established that its indirect selling expenses varied across levels of trade. *See* Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 45. Commerce fails to explain, however, either in its brief or in the administrative record, why it was able to reach a different conclusion in this case when NTN's allocation methodology was virtually identical to the one used in the antifriction bearings case. Accordingly, this issue is remanded to Commerce to explain how it determined that indirect selling expenses varied across levels of trade and, if it is unable to do so, to deny the adjustment.

### 6. *Use of Transfer Prices in Calculation of Indirect Expenses*

■ Timken contends that Commerce erred in accepting NTN's claimed adjustments to U.S. price calculated on the basis of transfer prices. Timken stresses that Commerce generally considers transfer prices to be unreliable and subject to manipulation. Pl.'s Mem.Supp.Mot.J.Agency R. at 79–82.

Timken also takes issue with Commerce's acceptance of NTN's allocation of expenses to transactions based upon transfer prices which allegedly do not vary according to level of trade. The result, according to Timken, was the mixture of value-based and cost-based allocations which were not representative of the expenses actually incurred with respect to individual sales. *Id.* at 82–83.

Commerce counters that at verification it found NTN's transfer prices to be stable and not subject to any obvious distortions. Accordingly, Commerce was satisfied that the transfer prices submitted by NTN provided an accurate measure of the costs of the goods sold. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 49–50.

Commerce agrees, however, that a remand is appropriate for reallocation of certain expenses over sales value as opposed to over the costs of goods sold. Specifically, Commerce requests a remand to reallocate U.S. inland freight expenses from NTN's warehouse to its customers, U.S. indirect advertising expenses and U.S. indirect selling expenses. *Id.* at 51.

Defendant-intervenor NTN supports Commerce's acceptance of NTN's transfer prices as reasonable. NTN emphasizes that Timken has failed to present any evidence of price manipulation. Def.–Int. NTN's Opp'n to Pl.'s Mot.J.Agency R. at 24–26.

In the Final Results, Commerce explained its reasons for accepting NTN's transfer prices as follows:

> We verified NTN's ... transfer prices and U.S. expense allocation methodology and, despite Timken's allegation that NTN understated its adjustments, we found no evidence that any respondent misstated its transfer prices or that any respondent's expense allocation methodologies are inaccurate.

58 Fed.Reg. at 64,725.

■ In general, Commerce may rely on transfer prices provided that substantial evidence on the agency record supports a finding that the transactions were arm's length. *Hyster Co. v. United States,* 18 CIT ——, ——, 848 F.Supp. 178, 187 (1994). This Court has upheld Commerce's decision to rely on transfer prices where respondents were able to demonstrate that transfer prices either equaled or exceeded the cost of production. *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 412. In the administrative review at issue in *Federal–Mogul,* Commerce tested the reliability of transfer prices by randomly comparing transfer prices for several products with the corresponding costs of production. *See Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order,* 58 Fed.Reg. at 39,741. In contrast, in the present case, Commerce does not provide any description of measures taken to test the reliability of the transfer prices used. Commerce refers to the verification report where Commerce verified the accuracy of NTN's reporting, but there is no record evidence of any comparison between transfer prices and costs of production. *See Verification of NTN's Questionnaire Response—Tapered Roller Bearings and Parts Thereof From*

*Japan,* C.R. Document No. 101, Fiche 291, Frames 10–11. In addition, in the *Final Results* Commerce states only that it was satisfied that the respondent did not "misstate" the transfer prices. The fact that NTN may have accurately reported the transfer prices does not lead to the conclusion that the prices were representative of the costs of production.

██ As for Timken's contentions concerning Commerce's mixing of value-based and cost-based allocations, the Court finds Timken's arguments to be without merit. Timken does not cite any statutory support for its objections to Commerce's methodology. This Court has acknowledged that "Commerce is afforded great latitude in the choice of methodology to be employed in antidumping investigations." *Torrington,* 19 CIT at ——, 881 F.Supp. at 646 (citing *Mitsubishi Elec. Corp. v. United States,* 12 CIT 1025, 1050, 700 F.Supp. 538, 558 (1988), *aff'd,* 898 F.2d 1577 (Fed.Cir.1990)). In *Torrington,* this Court further stated that "[a]s long as Commerce's methodology [is] reasonable and there is substantial evidence in the record supporting Commerce's conclusions, the Court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Id.* at ——, 881 F.Supp. at 646. The Court finds that Commerce's decision to allocate expenses over costs of goods instead of sales value was reasonable except with respect to the specific expenses cited by Commerce for the reasons stated in its proprietary brief. *See* Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 51.

For the reasons stated above, the Court finds that Commerce's decision to rely on transfer prices is not supported by substantial evidence on the agency record. This issue is remanded so that Commerce may provide evidence of any tests performed to verify the accuracy of the transfer prices and, if it is unable to do so, to deny the adjustment and to reallocate NTN's expenses without using transfer prices. If Commerce is able to point to evidence that the transfer prices represent arm's-length transactions, then Commerce must reallocate only the following three categories of expenses: (1) U.S. inland freight expenses from NTN's warehouse to its customers; (2) U.S. indirect advertising expenses; and (3) U.S. indirect selling expenses.

### 7. *Adjustments to NTN's U.S. Price*

██ Timken claims that Commerce erred in deducting imputed interest on cash deposits from U.S. selling expenses. Timken asserts that the statute does not provide a basis for such a deduction and, even if there were a statutory basis, the expenses claimed by NTN were unsubstantiated on the administrative record. Pl.'s Mem.Supp.Mot.J.Agency R. at 86–90. According to Timken, this issue is distinguishable from Commerce's practice of declining to deduct cash deposits of estimated antidumping duties from ESP which has been upheld by this Court. *Id.* at 86 (citing *Federal–Mogul Corp. v. United States,* 17 CIT 88, 108, 813 F.Supp. 856, 872 (1993)). Timken emphasizes that NTN's calculation of interest on cash deposits is merely hypothetical in nature since it is based on a presumption that NTN will not receive a refund of its deposits. Pl.'s Mem.Supp.Mot.J.Agency R. at 89.

In rebuttal, Commerce argues that it properly refused to deduct from ESP expenses attributable to imputed interest on cash deposits. Commerce contends that the rationale underlying the Court's decision in *Federal–Mogul,* 17 CIT at 108, 813 F.Supp. at 872, holding that deposits of estimated antidumping duties may not be deducted from U.S. price pursuant to 19 U.S.C. § 1677a(d)(2)(A) (1988), applies to imputed interest as well. Commerce characterizes the imputed interest expense as a "missed opportunity cost" similar to the cash deposits of estimated duties. According to Commerce, failure to exclude these expenses from its deductions to ESP would impermissibly allow past margins to influence the determination of present margins. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 51–53.

NTN supports Commerce's position on this issue. NTN adds that the refund of overpayment of antidumping duties with interest does not adequately compensate NTN

for its selling expenses. Def.–Int. NTN's Opp'n to Pl.'s Mot.J.Agency R. at 27–28.

Commerce supports its decision not to deduct the expense at issue from U.S. price, stating that it verified the interest expenses and "absent sufficient evidence from Timken that NTN's claimed adjustments are unreasonable, [Commerce has] no reason to reject them for these final results." *Final Results,* 58 Fed.Reg. at 64,726. Commerce failed to explain adequately on the record its reasons for refusing to deduct the imputed interest from U.S. price. In *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 412–13, this Court granted Commerce's request for a remand to reconsider its approach on whether or not it should treat cash deposits and the interest on the cash deposits in the same manner. While Commerce has presented some arguments in its briefs presently before the Court, Commerce failed to state on the administrative record any support for its treatment of interest on cash deposits. Accordingly, the Court remands this case to Commerce to provide a reasonable explanation on the record for accepting NTN's downward adjustments to U.S. indirect selling expenses for interest paid on cash deposits.

### 8. *Methodological Errors Concerning NTN*

 Timken alleges that Commerce made two methodological errors regarding NTN.[5] The first error alleged by Timken concerns model coding for a particular customer. Timken contends that certain part numbers should have been included in Commerce's calculation of weighted-average FMV. Pl.'s Mem.Supp.Mot.J.Agency R. at 91–92. Commerce responds that its methodology is reasonable and that Timken's approach would impose a heavy burden on Commerce. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 54–55. Defendant-intervenor NTN supports Commerce's approach as being consistent with its prior practice. Def.–Int. NTN's Opp'n to Pl.'s Mot.J.Agency R. at 29.

The Court agrees with Commerce and NTN that the methodology Commerce employed was reasonable and consistent with law. The Court has already noted the amount of latitude granted to Commerce in choosing the manner in which to calculate antidumping duties. *See supra* at 21. The Court agrees with Commerce that its decision to first match identical merchandise by nomenclature is reasonable and consistent with its prior practice. *See Timken Co. v. United States,* 16 CIT 429, 438, 795 F.Supp. 438, 446 (1992) (sustaining Commerce's use of nomenclature for matching identical sales). The method proposed by Timken would be unduly burdensome considering the time constraints within which Commerce must calculate antidumping duties. Accordingly, the Court sustains Commerce on the issue concerning part numbers.

The second alleged error concerns NTN's reporting of U.S. expenses. According to Timken, NTN's methodology resulted in the underreporting of U.S. expenses. Pl.'s Mem.Supp.Mot.J.Agency R. at 92–93. Commerce rejected this claim in the Final Results and upheld NTN's allocation methodology. 58 Fed.Reg. at 64,725. Commerce adheres to its conclusion that NTN's reporting of U.S. expenses was accurate and no methodological error occurred. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 56. NTN supports Commerce's position on this issue. Def.–Int. NTN's Opp'n to Pl.'s Mot.J.Agency R. at 29–30.

Upon a review of the record, the Court has not located any error concerning the calculation of NTN's U.S. expenses. The alleged discrepancies claimed by Timken are explained by Commerce in its proprietary brief and supported by the record. *See, e.g.,* Questionnaire Response of NTN, Exhibit B–8, C.R. Document No. 39, Worksheet 14, Fiche 179, Frames 17–33. Accordingly, the Court upholds Commerce's determination on this issue.

### 9. *Koyo's Billing Adjustments*

 In this review, Commerce accepted Koyo's allocation of home market billing ad-

---

5. Timken withdrew its objection to Commerce's acceptance of NTN's reporting of general and administrative expenses for cost of production

and constructed value purposes. Pl.'s Reply to Opp'n to Mot.J.Agency R. at 48.

justments stating that it "found them to be reasonably allocated and reflective of sales of in-scope merchandise." 58 Fed.Reg. at 64,-724. According to Timken, this finding by Commerce is inaccurate because Koyo failed to report the billing adjustments on a transaction- or product-specific basis. Pl.'s Mem.Supp.Mot.J.Agency R. at 94. Timken further notes that the record indicates that adjustments were neither limited to the subject merchandise nor made as a fixed percentage of all sales of in-scope and out-of-scope merchandise. *Id.* Timken emphasizes this Court's prior decisions holding that Commerce may not allow adjustments for post-sale price adjustments ("PSPAs") on sales of out-of-scope merchandise. *Id.* at 95–96 (citing *Torrington Co. v. United States,* 17 CIT 199, 218, 818 F.Supp. 1563, 1578–79 (1993), *aff'd,* 82 F.3d 1039 (Fed.Cir.1996); *Federal–Mogul Corp. v. United States,* 17 CIT 1093, 1102–03, 834 F.Supp. 1391, 1400 (1993)).

Commerce agrees that a remand is necessary to "revisit its approach to the allocation of home market billing expenses and, if necessary, to obtain additional information relevant to the new methodology to be used by Commerce." Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 57.

Defendant-intervenor Koyo disagrees with Timken and Commerce arguing that a remand on this issue is inappropriate. Koyo asserts that Commerce followed the decisions of this Court in determining that Koyo's allocations justified treating the billing adjustments as indirect expenses. Def.–Int. Koyo's Opp'n to Pl.'s Mot.J.Agency R. at 33–34.

This Court has consistently held that adjustments for merchandise outside the scope of an antidumping order cannot be used to calculate antidumping duties. *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 408; *Torrington,* 19 CIT at ——, 881 F.Supp. at 640; *Torrington,* 17 CIT at 218, 818 F.Supp. at 1578–79. The CAFC recently affirmed this Court's decision in *Torrington,* 17 CIT at 218, 818 F.Supp. at 1578–79, stating that in situations involving allocations over scope and non-scope merchandise, the determination of whether an adjustment to FMV is

appropriate pursuant to 19 C.F.R. § 353.56(b)(2) depends on whether the expenses are direct or indirect. *Torrington,* 82 F.3d at 1049–50. In addressing this issue, the CAFC emphasized the language contained in the ESP offset regulation providing for "a deduction from [foreign market value] for all selling expenses *except direct selling expenses.*" 19 C.F.R. § 353.56(b)(2) (emphasis added). The CAFC further held that the determining factor for whether PSPAs qualify for ESP offset treatment is the method used to calculate the PSPAs as opposed to the allocation or recordation methods. *Torrington,* 82 F.3d at 1050–51. Thus, the relevant determination in the present case is whether Koyo's billing adjustments are direct or indirect expenses according to Koyo's calculation methodology.

The situation presented here is identical to that in *Torrington* where the CAFC refused to allow Koyo's direct selling expenses to be treated as indirect selling expenses pursuant to the ESP offset regulation. In *Torrington,* the CAFC found that PSPAs are related to particular sales and vary with the quantity of the particular item sold. *Id.* Therefore, in spite of Koyo's decision to allocate its adjustments over sales to all customers, Koyo's home market PSPAs constitute direct selling expenses because of their direct relationship to the sales under consideration. Koyo's allocation methodology precludes Commerce from treating these billing adjustments as direct expenses but does not alter the direct relationship between the expenses and the particular sales. Therefore, Commerce may not permit a deduction from FMV for Koyo's PSPAs. Accordingly, this issue is remanded to Commerce to deny the adjustment to FMV for Koyo's home market billing adjustments.

### 10. *NSK's Billing Adjustments*

In this review, NSK allocated its total lump-sum adjustments "based on the proportion of in-scope merchandise to total merchandise purchased by that customer during the [period of review]." *Final Results,* 58 Fed.Reg. at 64,723. Commerce accepted NSK's lump-sum price adjustments stating that it "verified NSK's methodology and sup-

porting documents and was satisfied that the allocation is representative of the costs NSK incurred." *Id.* Timken objects to Commerce's acceptance of NSK's allocation methodology for similar reasons to its objections concerning Koyo. Essentially, Timken alleges that NSK's allocation methodology results in the inclusion of out-of-scope merchandise in adjustments to FMV. Pl.'s Mem.Supp.Mot.J.Agency R. at 98–100.

Commerce concedes that NSK calculated its post-sale price adjustments on the basis of sales of both in-scope and out-of-scope merchandise and, therefore, Commerce requests a remand to reconsider its acceptance of NSK's allocation. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 57.

Defendant-intervenor NSK contends that Commerce properly granted NSK an adjustment to FMV for lump-sum price adjustments. NSK notes that it allocated the payments at issue based on customers' purchasing patterns and that Commerce verified that the monthly scope/non-scope purchasing patterns of NSK's customers did not vary from month to month. Def.–Int. NSK's Opp'n to Pl.'s Mot.J.Agency R. at 25–26.

The same analysis the Court applied to Koyo's billing adjustments is applicable to NSK. *See supra* at 632–633. Thus, the relevant determination is whether NSK's lump-sum adjustments constitute direct or indirect expenses regardless of NSK's method of allocation and recordation. NSK's lump-sum adjustments account for price increases or decreases calculated with respect to a specific customer for a specific period of time. *See Prehearing Rebuttal Brief on Behalf of NSK Ltd. and NSK Corporation*, P.R. Document No. 345, Fiche 153, Frame 53. Similar to Koyo's PSPAs, NSK's lump-sum PSPAs represent particular sales and they vary with the quantity of the particular item sold. Therefore, NSK's lump-sum PSPAs are direct expenses which may not be the basis for a deduction from FMV pursuant to 19 C.F.R. § 353.56(b)(2). As such, this issue is remanded to Commerce to deny the adjustment to FMV for NSK's lump-sum billing adjustments.

11. *Verification of NSK*

Timken argues that Commerce erred in refusing to consider information obtained in the 1991–92 verification of NSK for purposes of establishing NSK's costs for the 1990–91 administrative review. Timken claims that Commerce expressly intertwined the 1990–91 and 1991–92 reviews and that the verification report for the 1991–92 period of review contained information relevant to NSK's costs for the 1990–91 period of review. Accordingly, Timken submits that Commerce acted contrary to law by ignoring relevant information. Pl.'s Mem.Supp.Mot.J.Agency R. at 102 (citing *Floral Trade Council v. United States*, 13 CIT 242, 242–43, 709 F.Supp. 229, 230–31 (1989)). Timken additionally notes that there is no statutory provision or regulation forbidding Commerce from using information across reviews. Pl.'s Mem.Supp.Mot.J.Agency R. at 103.

In rebuttal, Commerce argues that it is well-established law and agency practice that each individual administrative review is an independent and distinct proceeding. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 57–58.

Defendant-intervenor NSK supports Commerce on this issue stating that Commerce must base its determinations on evidence on the agency record unless other evidence is "expressly intertwined" with the record evidence. Def.–Int. NSK's Opp'n to Pl.'s Mot.J.Agency R. at 27 (citing *Win–Tex Products, Inc. v. United States*, 16 CIT 760, 762–63, 797 F.Supp. 1025, 1027 (1992)). NSK maintains that there is no evidence that Commerce expressly intertwined the administrative record of the 1990–91 reviews with that of the 1991–92 reviews.

The Court finds that Commerce was not required to consider the information contained in the 1991–92 verification in reaching its conclusions in the 1990–91 reviews. Timken's reliance on *Floral Trade* to support its contentions is misplaced as the facts of that case are completely distinguishable from the ones presently before the Court. In *Floral Trade*, 13 CIT at 243, 709 F.Supp. at 230–31, the court held that where an the agency expressly incorporates relevant information from previous investigations into the

proceeding at issue, such information becomes part of the record for purposes of court review. In reaching this decision, the court noted that "the agency cannot ignore relevant information which is before it, and the reviewing court must be in a position to determine if it had done so." *Id.* at 242–43, 709 F.Supp. at 230. However, the court recognized that not all documents before the agency become part of the record but, rather, only those documents at the agency level "which become sufficiently intertwined with the relevant inquiry." *Id.* at 243, 704 F.Supp. at 230. The *Floral Trade* court decided that documents from prior investigations were "sufficiently intertwined" with the evidence concerning the investigation before the court because the agency had "expressly incorporated such information into the proceeding at issue" by stating on the record, without qualification, that it had examined the previous investigations. *Id.* at 243, 709 F.Supp. at 230–31. In *Win–Tex Products,* 16 CIT at 762–63, 797 F.Supp. at 1027, the court distinguished *Floral Trade* when it denied an application to supplement the record of a scope investigation with information from an earlier scope investigation. In so doing, the Court noted that "[i]ndeed, '[t]he record for judicial review should ordinarily not contain material from separate investigations.'" 16 CIT at 762–63, 797 F.Supp. at 1027 (citing *Bethlehem Steel Corp. v. United States,* 5 CIT 236, 566 F.Supp. 346 (1983)).

Commerce's decision to deny Timken's request to consider the information from the 1991–92 verification proceeding is consistent with law. In the *Final Results,* Commerce explained the reasons for its decision as follows:

> [W]e do not wish to hold NSK responsible for the Department's delay in conducting the 1990–91 reviews. Furthermore, it is our general practice not to apply the results of verification of a period to preceding review periods. Therefore, we have not adjusted NSK's response for the 1990–91 reviews for discrepancies found in verifying the 1991–92 reviews.

58 Fed.Reg. at 64,723–24. This statement is contrary to the suggestion by Timken that Commerce expressly embraced the informa-

tion contained in the 1991–92 reviews and incorporated it into the 1990–91 reviews. In fact, Commerce specifically did not intertwine the reviews. As such, Commerce was not required to include information from the 1991–92 verification in the final determination concerning the 1990–91 reviews. For the reasons stated above, the Court sustains Commerce on this issue.

### 12. *Clerical Errors*

Timken requests a remand for the correction of various clerical errors. The first error concerns the failure of Commerce for the 1990–91 and 1991–92 reviews to attach a model number name to the results of the set-splitting program with respect to certain models sold in Koyo's home market. Pl.'s Mem.Supp.Mot.J.Agency R. at 54, 60. Commerce proposes to correct the error on remand by assigning each split cup and cone a unique name. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 36.

The second error alleged by Timken is Commerce's misspelling of the variable "SAALWE" (representing "Sales Allowance") as "SALLWE" in calculating Koyo's margins for the 1990–91 and 1991–92 review periods resulting in the exclusion of a significant volume of transactions. Pl.'s Mem.Supp.Mot.J.Agency R. at 55, 60–61. Commerce agrees that a remand is necessary to correct the spelling mistake. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 36.

The third claimed error involves a problem in the program used to implement the cost test applicable to NSK's 1990–91 and 1991–92 sales. Timken points out that the program was based only on part number and not on part type. Pl.'s Mem.Supp.Mot.J.Agency R. at 56, 61–64. Commerce agrees that a remand is necessary to correct the program to include both part number and part type. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 36. Defendant-intervenor NSK also requests a remand for Commerce to correct this error. Def.–Int. NSK's Opp'n to Pl.'s Mot.J.Agency R. at 31.

Finally, Timken maintains that the computer program applicable to NTN for the 1991–92 review period contained a fundamental error resulting in seriously understated

values for cost of production and constructed value. Pl.'s Mem.Supp. of Mot. for J.Agency R. at 59. Commerce requests a remand so that it may eliminate this error. Def.'s Opp'n to Pl.'s Mot.J.Agency R. at 37. NTN agrees that the alleged error exists and should be corrected. Def.–Int. NTN's Opp'n to Pl.'s Mot.J.Agency R. at 28.

Upon a review of the record and in light of the agreement of all relevant parties, the Court finds that a remand is necessary to correct all of the above clerical errors.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) deny adjustment to FMV for pre-sale home market transportation expenses where FMV was calculated using purchase price; (2) explain its method for determining that NTN's indirect expenses varied across levels of trade and, if it is unable to do so, deny the adjustment; (3) provide evidence of tests performed to verify the accuracy of NTN's transfer prices and, if unable to do so, deny the adjustment and reallocate NTN's expenses without using transfer prices; (4) reallocate NTN's U.S. inland freight expenses from NTN's warehouse to its customers, NTN's U.S. indirect advertising expenses and NTN's U.S. indirect selling expenses; (5) provide a reasonable explanation on the record for accepting NTN's downward adjustments to U.S. indirect selling expenses for interest paid on cash deposits; (6) deny the adjustment to FMV for Koyo's home market billing expenses; (7) deny the adjustment to FMV for NSK's lump-sum billing adjustments; and (8) correct various clerical errors. Commerce is sustained on all other issues.

Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.

### ORDER

This case having been duly submitted for decision and the Court, after due delibera-tion, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to: (1) deny adjustment to FMV for pre-sale home market transportation expenses where FMV was calculated using purchase price; (2) explain its method for determining that NTN's indirect expenses varied across levels of trade and, if it is unable to do so, deny the adjustment; (3) provide evidence of tests performed to verify the accuracy of NTN's transfer prices and, if unable to do so, deny the adjustment and reallocate NTN's expenses without using transfer prices; (4) reallocate NTN's U.S. inland freight expenses from NTN's warehouse to its customers, NTN's U.S. indirect advertising expenses and NTN's U.S. indirect selling expenses; (5) provide a reasonable explanation on the record for accepting NTN's downward adjustments to U.S. indirect selling expenses for interest paid on cash deposits; (6) deny the adjustment to FMV for Koyo's home market billing expenses; (7) deny the adjustment to FMV for NSK's lump-sum billing adjustments; and (8) correct various clerical errors; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.