TIMKEN CO., PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND NTN BEARING CORP. OF AMERICA, AMERICAN NTN BEARING MANUFACTURING CORP., NTN CORP., KOYO SEIKO CO., LTD., KOYO CORP. OF U.S.A., NSK LTD., AND NSK CORP., DEFENDANT-INTERVENORS

Consolidated Court No. 94–01–00008

(Dated July 3, 1997)

*Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., William A. Fennell* and *Mara Burr)* for plaintiff.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Velta A. Melnbrencis);* of counsel: *Carlos A. Garcia,* Attorney-Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

*Barnes, Richardson & Colburn (Donald J. Unger* and *Jesse M. Gerson)* for defendant-intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation.

*Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis* and *Elizabeth C. Hafner)* for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

*Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe* and *Grace W. Lawson)* for defendant-intervenors NSK Ltd. and NSK Corporation.

## OPINION

TSOUCALAS, *Senior Judge:* On May 31, 1996, this Court, in *Timken Co. v. United States,* 20 CIT 645, 930 F. Supp. 621 (1996), remanded to the Department of Commerce, International Trade Administration ("Commerce"), the final determination concerning the administrative reviews of the antidumping duty order concerning tapered roller bearings, entitled *Final Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Final Results"),*

58 Fed. Reg. 64,720 (1993). The Final Results covered tapered roller bearings imported from Japan during the periods of October 1, 1990 through September 30, 1991, and October 1, 1991 through September 30, 1992. *See Final Results*, 58 Fed. Reg. at 64,720. The Court ordered Commerce to: (1) deny adjustment to foreign market value ("FMV") for pre-sale home market transportation expenses where FMV was calculated using purchase price; (2) explain its method for determining that the indirect expenses of NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation (collectively "NTN") varied across levels of trade and, if it is unable to do so, deny the adjustment; (3) provide evidence of tests performed to verify the accuracy of NTN's transfer prices and, if unable to do so, deny the adjustment and reallocate NTN's expenses without using transfer prices; (4) reallocate NTN's U.S. inland freight expenses from NTN's warehouse to its customers, NTN's U.S. indirect advertising expenses and NTN's U.S. indirect selling expenses; (5) provide a reasonable explanation for accepting NTN's downward adjustment to U.S. indirect selling expenses for interest paid on cash deposits; (6) deny the adjustment to FMV for home market billing expenses of Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"); (7) deny the adjustment to FMV for lump-sum billing adjustments of NSK Ltd. and NSK Corporation (collectively "NSK"); and (8) correct various clerical errors.

On November 21, 1996, Commerce released draft remand results and invited interested parties to comment. After receiving comments from The Timken Company ("Timken"), Koyo and NTN, Commerce filed its *Final Results of Redetermination Pursuant to Court Remand, The Timken Company v. United States, Slip Op. 96–86 (May 31, 1996) ("Remand Results")*.

Plaintiff Timken moves for a second remand claiming that Commerce's decision to accept NTN's adjustment to its U.S. indirect selling expenses for imputed interest on cash deposits was inconsistent with law.

Defendant-intervenor NTN contests Commerce's conclusion in the Remand Results that it could not accept NTN's allocation methodology as a basis for a level of trade adjustment.

## 1. *Imputed Interest on Cash Deposits:*

In the Final Results, Commerce deducted imputed interest for cash deposits from NTN's U.S. selling expenses. 58 Fed. Reg. at 64,726. In *Timken*, the Court remanded the issue to Commerce "to provide a reasonable explanation on the record for accepting NTN's downward adjustments to U.S. indirect selling expenses for interest paid on cash deposits." *Id.* at 656, 930 F. Supp. at 631. In the Remand Results, Commerce explains that it considers the imputed interest expenses at issue to be comparable to expenses for legal fees related to antidumping duty proceedings. Commerce emphasizes that the imputed interest ex-

penses, like legal fees, were incurred only because of the existence of an antidumping duty order involving NTN. Commerce insists that imputed interest expenses are not selling expenses since they were not incurred to facilitate selling merchandise in the United States but, rather, to comply with the statute due to the existence of an antidumping duty order. *Remand Results* at 23–24.

Timken recognizes that this Court upheld Commerce's treatment of NTN's imputed interest expenses in *Federal-Mogul Corp. v. United States*, 20 CIT 1438, 1440–41, 950 F. Supp. 1179, 1183 (1996), *appeals docketed*, No. 97–1253 (Fed. Cir. Feb. 27, 1997), No. 97–1321 (Fed. Cir. Apr. 18, 1997). Timken asserts, however, that Commerce's detailed explanation in the Remand Results raises legal issues that must be addressed by the Court. Timken argues that the effect of Commerce's practice is to mask significant amounts of dumping. *Timken's Comments on Commerce's Remand Results ("Timken's Comments")* at 2–3. Timken further contends that Commerce's actions contravene the purpose of the antidumping statue by allowing respondents to delay the economic impact of deposits until liquidation. According to Timken, if Congress had intended the result created by Commerce's downward adjustment, Congress would have provided for interest payments on all deposits, not just overpayments. *Id.* at 6–7 (citing 19 U.S.C. § 1677g (1988)). Timken further contends that Commerce's actions are inconsistent with legislative intent. *Id.* at 8–13. Finally, Timken maintains that because Commerce's rationale for the adjustment appears to be based only on duty deposit overpayments, it was improper for Commerce to permit an adjustment for interest on all of NTN's cash deposits. *Id.* at 13–15.

Commerce responds that 19 U.S.C. § 1677a(e)(2) (1988) provides for a deduction to U.S. price only for expenses incurred to sell merchandise in the United States. Commerce insists that the interest expenses at issue, like legal fees, are not selling expenses and, therefore, are properly deductible from NTN's U.S. indirect selling expenses. Commerce emphasizes that a respondent possesses the discretion to eliminate price discrimination upon the imposition of antidumping duties and that, while a company implements any changes, it still incurs a financing cost due to the statutory requirement of cash deposits. *Def.'s Response to Timken's Comments ("Def.'s Response")* at 3–5. Relying on *Federal-Mogul*, 20 CIT at 1440–41, 950 F. Supp. at 1183, Commerce maintains that Timken has failed to demonstrate that Commerce's practice is inconsistent with law. *Def.'s Response* at 5–7.

Koyo and NTN, defendant-intervenors, agree with Commerce's decision to permit a downward adjustment for interest on cash deposits and supports Commerce's explanation in the Remand Results. *See Koyo's Comments on Def.'s Results of Redetermination* at 2–5; *NTN's Rebuttal to Timken's Comments* at 1–2.

As Timken acknowledges, this Court upheld Commerce's acceptance of a downward adjustment to indirect selling expenses for antidumping

duty cash deposits in *Federal-Mogul*, 20 CIT at 1440–41, 950 F. Supp. at 1183. Timken presents some new arguments in this case, but none alters the Court's conclusion that "the interest NTN paid for antidumping duty deposits is not a selling expense and, thus, should be excluded from NTN's U.S. indirect selling expenses." *Id.* Contrary to Timken's allegations, Congress has not addressed this issue. Timken has not pointed to anything in either the statute or the legislative history that prohibits the adjustment to indirect selling expenses. The statue requires cash deposits upon entry and interest on those deposits to be paid upon liquidation. *See* 19 U.S.C. §§ 1677g, 1673b(d)(2) (1988). The legislative history cited by Timken does not support its position, as Congress merely commented on the benefits of requiring cash deposits as opposed to bonds. *See Timken's Comments* at 9–12 (citing *Recommendations Submitted by Interested Individuals and Organizations on Amendments in U.S. Laws to Provide Relief From Unfair Trade Practices*, 95th Cong., 2d Sess. 21 (1978)). Commerce is not tampering with the requirement of cash deposits by permitting NTN's downward adjustment to indirect selling expenses.

In light of Congress's silence on this issue, the Court finds that Commerce acted reasonably and within its discretion by allowing the adjustment. As the Court stated in *Federal-Mogul*, 20 CIT at 1441, 950 F. Supp. at 1183, "the adjustment to NTN's indirect selling expense reflects an actual expense to NTN that should not be included among NTN's selling expenses." Contrary to Timken's assertions, Commerce's rationale is not based on duty deposit overpayments. The passage in the Remand Results relied upon by Timken is the following:

> [W]hen a respondent finances cash deposits it incurs a financing expense which reflects the opportunity costs which arise when funds are used to pay cash deposits rather than other interest-yielding financial arrangements. Because the monies used to fund cash deposits for a given POR [period of review] are unavailable until final antidumping duties are assessed for that POR, this opportunity cost will accrue until liquidation.

*Remand Results* at 32. Commerce's statement reflects the reality that an importer incurs a financing cost due to cash deposits regardless of the amount of antidumping duties ultimately assessed. If an importer did not have to set aside funds for cash deposits, an importer could use that money to earn interest. In *Federal-Mogul*, this Court recognized a distinction between the interest allowed under the statute and the opportunity costs suffered by an importer. The Court stated that while the statute compensates an importer for the amount of cash deposit never actually owed, the adjustment compensates the importer for an actual expense that is independent of any refund due. *Federal-Mogul*, 20 CIT at 1441, 950 F. Supp. at 1183. Thus, even if an importer is not entitled to have any amount of the cash deposit returned at the time of liquidation, the importer has incurred an opportunity cost by not having access to funds that could have been used for "other interest-yielding financial

arrangements." *Remand Results* at 32. As such, Commerce's rationale supports an adjustment for imputed interest on the entire amount of the cash deposit rather than on only the overpayment. Therefore, the Court sustains Commerce's position on this issue.

2. *Level of Trade Adjustment for NTN:*

In the Final Results, Commerce accepted NTN's allocation of various indirect selling expenses based on levels of trade. 58 Fed. Reg. at 64,725. Addressing Timken's challenge, the Court remanded the Final Results to Commerce to explain how it determined that the indirect selling expenses varied across various levels of trade and, if it was unable to do so, to deny the adjustment. *Timken*, 20 CIT at 653, 930 F. Supp. at 629. In the Remand Results, Commerce concluded that NTN failed to provide any narrative or quantitative evidence demonstrating that the indirect selling expenses actually varied according to level of trade. Commerce concluded that "NTN's sole support for its allocations are the allocations themselves." *Remand Results* at 9. Accordingly, Commerce denied a level of trade adjustment for NTN's indirect selling expenses. *Id.* at 9–11.

According to NTN, Commerce possessed sufficient information from NTN to justify a level of trade adjustment. NTN specifically objects to Commerce's statement that the only support for NTN's allocations are NTN's allocations. *NTN's Comments on Commerce's Remand Results* at 1–2.

Commerce's decision in the Remand Results to deny a level of trade adjustment for NTN is consistent with the Court's decision and remand order in *Timken*, 20 CIT at 652–53, 930 F. Supp. at 628–29. In order to receive a level of trade adjustment, a respondent must demonstrate that the expenses at issue vary according to level of trade. *Id.* at 653, 930 F. Supp. at 628; *NTN Bearing Corp. of Am. v. United States*, 19 CIT 1221, 1234, 905 F. Supp. 1083, 1094–95 (1995). This Court has consistently upheld a denial of a level of trade adjustment where a respondent has failed to demonstrate that differences in price were directly attributable to differences in level of trade. *See, e.g., Koyo Seiko Co. v. United States*, 20 CIT 772, 777, 932 F. Supp. 1488, 1493 (1996), *NTN Bearing Corp.*, 19 CIT at 1234, 905 F. Supp. at 1094–95, *NTN Bearing Corp. of Am. v. United States*, 17 CIT 1149, 1154, 835 F. Supp. 646, 650 (1993). In the Remand Results, Commerce explained that it was unable to determine on the basis of the information provided by NTN whether expenses varied according to level of trade. *See Remand Results* at 8–10. Commerce's conclusion is supported by the record and consistent with law. Consequently, Commerce's decision to deny a level of trade adjustment for NTN is sustained.

3. *Other Issues:*

Pursuant to the Court remand order Commerce also addressed the following: (1) denied an adjustment for NTN to FMV for home market pre-sale inland freight expenses in instances in which Commerce

compared FMV to purchase price; (2) deducted pre-sale inland freight expenses of NSK, NTN and Koyo from FMV pursuant to the exporter's sales price ("ESP") offset provision; (3) determined that NTN's transfer prices were unreliable and, therefore, reallocated all of NTN's U.S. expenses after excluding transfer prices; (4) denied an adjustment to FMV for Koyo's home market billing adjustments; (5) denied an adjustment to FMV for NSK's lump-sum post-sale price adjustments; and (6) corrected various clerical errors. The Court finds all of the above actions to be in accordance with the Court's remand order in *Timken* and consistent with law. Accordingly, the Court affirms Commerce's Remand Results.

## CONCLUSION

In accordance with the foregoing opinion, the Court finds that Commerce's Remand Results are consistent with law and supported by substantial evidence on the record. Therefore, Commerce's Remand Results are affirmed and this case is dismissed.