**FEDERAL–MOGUL CORPORATION, Plaintiff and Plaintiff–Intervenor,**

**The Torrington Company, Plaintiff and Plaintiff–Intervenor,**

v.

**UNITED STATES, Defendant,**

**SKF USA INC., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A. and SKF Sverige AB; SNR Roulements; Meter S.p.A.; NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and**

NTN Kugellagerfabrik (Deutschland) GmbH; NSK Ltd. and NSK Corporation; Emerson Power Transmission Corporation; INA Walzlager Schaeffler KG and INA Bearing Company, Inc.; Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; RHP Bearings and RHP Bearings Inc.; NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd., NMB Thai Ltd. and Pelmec Thai Ltd.; FAG Kugelfischer Georg Schafer KGaA, FAG Italia, S.p.A., FAG (U.K.) Limited, The Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation, Defendant–Intervenors.

Slip Op. 96–193.
Court No. 93–08–00461.

United States Court of
International Trade.

Dec. 12, 1996.

liam A. Fennell, Geert de Prest, John M. Breen, Lane S. Hurewitz, Myron A. Brilliant, Patrick J. McDonough and Amy S. Dwyer) for plaintiff and plaintiff-intervenor The Torrington Company.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jeffrey M. Telep); of counsel: Michelle Behaylo, Stacy J. Ettinger, Thomas H. Fine, Anna Park, Alexandra Levinson and David Ross) for defendant.

Howrey & Simon (Herbert C. Shelley, Alice A. Kipel, Anne Talbot and Patricia M. Steele) for defendant-intervenors SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A. and SKF Sverige AB.

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano and Lawrence M. Friedman) for defendant-intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis, Robert A. Calaff and Susan M. Mathews) for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

White & Case (Walter J. Spak, William J. Clinton, David E. Bond and Edmund W. Sim) for defendant-intervenors NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd., NMB Thai Ltd. and Pelmec Thai Ltd.

### OPINION

TSOUCALAS, Senior Judge:

On February 13, 1996, this Court, in *Federal–Mogul Corp. v. United States,* 20 CIT ——, 918 F.Supp. 386 (1996), remanded the Department of Commerce, International Trade Administration's ("Commerce") final determination concerning the third administrative review of the antidumping duty order covering antifriction bearings ("AFBs"), entitled *Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order,* 58 Fed.Reg. 39,729 (1993), as amended, *Anti-*

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, Wil-

*friction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 58 Fed.Reg. 42,288 (1993); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France and the United Kingdom; Amendment to the Final Results of Antidumping Duty Administrative Reviews,* 58 Fed.Reg. 51,055 (1993); and *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 59 Fed.Reg. 9,469 (1994) (collectively *"Final Results"*). The Final Results covered the period May 1, 1991 through April 30, 1992. *Final Results,* 58 Fed.Reg. at 39,730.

On August 21, 1996, Commerce released draft remand results and invited the parties to comment. On September 20, 1996, upon receiving comments from several parties on the draft remand results, Commerce filed its *Results on Redetermination Pursuant to Court Remand ("Remand Results")*. As the Remand Results affect seventeen of the reviewed companies, *see Remand Results* at 1, several parties have submitted comments and rebuttals.

Plaintiff and plaintiff-intervenor, The Torrington Company ("Torrington"), alleges that Commerce erred in: (1) allowing NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH's (collectively "NTN") interest expenses on estimated duty deposits as an offset against actual U.S. selling expenses; and (2) determining that NMB Thai Ltd., Pelmec Thai Ltd. and NMB Corporation's ("NMB/Pelmec") Route B sales should be treated as home market sales. *Torrington's Comments on the Remand Results ("Torrington's Comments")*.

Defendant-intervenors, SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A. and SKF Sverige AB (collectively "SKF"), contend that Commerce erred in

making changes to the Final Results that were not at issue in this remand and, as a result, improperly disallowed certain SKF rebates and an SKF Italy cash discount. *Comments of SKF Regarding Final Results of Redetermination ("SKF's Comments")*.

Defendant-intervenor, NTN, argues that Commerce erred in: (1) improperly recalculating NTN's inventory carrying costs; and (2) failing to treat aftermarket as a different level of trade by not recognizing that NTN incurred different selling expenses at different levels of trade. *NTN's Comments on the Department of Commerce's Remand Results ("NTN's Comments")*.

### 1. NTN's Downward Adjustments for Indirect Interest Expenses

■ The Final Results allowed NTN's downward adjustment to total U.S. indirect selling expense for interest expenses on antidumping duty cash deposits. *See Final Results,* 58 Fed.Reg. at 39,749. This Court directed Commerce, upon remand, to reconsider its decision to accept NTN's downward adjustment. *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 412–13.

After reconsideration, Commerce determined that it properly allowed the downward adjustment. *Remand Results* at 26–29. Commerce likened the loan interest expenses at issue to legal fees, emphasizing that the expenses were incurred solely because of the antidumping duty orders, and so, could not be categorized as selling expenses. *Id.* at 26–27 (citing *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 270, 712 F.Supp. 931, 947 (1989)).

■ Torrington claims that the interest expenses at issue are selling expenses because they are incurred due to NTN's decision to sell the subject merchandise at less than fair value. *Torrington's Comments* at 6. Further, Torrington asserts that the adjustment for NTN's interest duplicates the interest paid on refund of excess cash deposits under 19 U.S.C. §§ 1673f(b) and 1677g (1988) and creates a windfall for the importer.[1] *Id.* at 4–5.

---

**1.** Torrington also argues that Commerce improperly imputed the interest expense by applying

This Court finds Torrington's arguments unpersuasive and is satisfied with Commerce's explanation for accepting NTN's downward adjustment to its U.S. indirect selling expenses. First, there is no support for Torrington's assertion that any expense related to antidumping proceedings is automatically a selling expense related to the sale of the subject merchandise. Indeed, pursuant to the rationale of *Daewoo*, such expenses are not necessarily selling expenses. In *Daewoo*, the court held that legal expenses related to antidumping duty proceedings are not selling expenses.[2] Similarly, the interest expenses in this case do not qualify as selling expenses, as they are not related to the sale of merchandise, but to NTN's participation in the antidumping proceeding.

Further, Torrington's suggestion that the NTN interest adjustment is duplicative of that allowed under the statute is incorrect. The statutory sections at issue compensate an importer for the amount of cash deposit Commerce determines was never actually owed. *See* 19 U.S.C. §§ 1673f(b) & 1677g. In contrast, the adjustment to NTN's indirect selling expense reflects an actual expense to NTN that should not be included among NTN's selling expenses.[3]

Consequently, the Court sustains Commerce's determination that the interest NTN paid for antidumping duty deposits is not a selling expense and, thus, should be excluded from NTN's U.S. indirect selling expenses.

## 2. NMB/Pelmec's Route B Sales as Home Market Sales

■ In the original less than fair value ("LTFV") investigation, Commerce excluded NMB/Pelmec's Route B sales[4] from its home market database, concluding that they were export sales. *See Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand*, 54 Fed.Reg. 19,117, 19,118–19 (1989). However, Commerce concluded in its Final Results that Route B sales should not be excluded because they are home market (Thailand) sales. *See Final Results*, 58 Fed.Reg. at 39,782–83. The Court remanded this issue

---

NTN's average borrowing rate to the verified amount of NTN's net cash deposits and then using the imputed number to offset NTN's total interest expenses. *Torrington's Comments* at 2–3. Torrington contends that Commerce improperly reduced the amount of interest expenses without assurance that NTN actually incurred cash deposit costs. *Id.* at 3–4 (citing *Federal–Mogul v. United States*, 17 CIT 1249, 1254–55, 839 F.Supp. 881, 885–86 (1993), *vacated*, 19 CIT ——, 907 F.Supp. 432 (1995)).

Torrington's reliance on *Federal–Mogul* is misplaced. First, the Court in that case did not hold that Commerce may never adjust actual selling expenses by an amount of imputed expenses. Further, because Commerce often lacks evidence that actual cash deposit interest expenses were actually incurred (*i.e.*, they are not recorded in the company financial records), Commerce *must* resort at times to imputed expenses. Commerce has a well-established practice of recognizing and adjusting for imputed expenses. *See, e.g., Portable Electric Typewriters From Japan; Final Results of Antidumping Duty Administrative Review*, 53 Fed.Reg. 40,926, 40,937 (1988) (noting that deductions for imputed costs have been upheld).

2. Torrington contends that *Daewoo* is distinguishable because the interest expense deductions at issue are not comparable to legal fee deductions, which are permitted to prevent frivolous lawsuits that would inflate expenses, hence

increasing dumping margins. *Id.* at 5–6. However, while the *Daewoo* court stated its concern over frivolous litigation, it indicated that this concern was not the sole basis for its decision to allow an exclusion of legal fees from U.S. indirect selling expenses. *Daewoo*, 13 CIT at 270, 712 F.Supp. at 947. The court stated: "[1] [it was] satisfied with Commerce's explanation that legal fees do not qualify as selling expenses, *and* [2] that it would also be against public policy to make an adjustment [because] . . . [it] might encourage frivolous claims." *Id.* (emphasis added).

3. Torrington argues that Commerce's policy improperly promotes the absorption of antidumping duties, rather than the adjustment of prices. *Torrington's Comments* at 7. There is no statutory support for Torrington's assertion that Commerce should deduct indirect expenses that are not selling expenses. Indeed, 19 U.S.C. § 1677a(e)(2) (1988) explicitly limits the deduction to *selling* expenses.

4. Route B sales involve merchandise that is exported from Thailand to NMB/Pelmec's Singapore affiliate, which then returns the merchandise to Thailand for delivery to an unrelated customer. *Federal–Mogul*, 20 CIT at ——, 918 F.Supp. at 417. Such sales are home market sales and occur because Thai law permits NMB/Pelmec to sell annually only a limited number of pieces directly to customers in Thailand. *Id.*

for Commerce to explain why it changed its findings.

Commerce explained upon remand that the Route B sales at issue are identical to the Route B sales in the second review. In the second review, Commerce concluded that Route B sales were home market sales. The Court upheld this treatment, stating that "the location of the [first unrelated] sale transaction has a significant bearing on how a sale is classified...." *Torrington Co. v. United States*, 20 CIT ——, ——, 926 F.Supp. 1151, 1161 (1996). In this case, NMB/Pelmec's first Route B sales to unrelated customers were made to customers *in Thailand* and NMB/Pelmec knew that the Route B sales shipped through Singapore were ultimately destined for delivery and consumption in Thailand. *Remand Results* at 35. Consequently, Commerce included the Route B sales at issue in the home market database.

The LTFV investigation, however, presented circumstances that required Commerce to exclude Route B sales. *Remand Results* at 34–35. Commerce concluded that the first unrelated transaction with respect to the merchandise NMB/Pelmec classified as Route B sales occurred in Singapore. *Id.* at 34. NMB/Pelmec's Singapore affiliate sold the merchandise to an unrelated customer *in Singapore* who then sold the merchandise to its affiliate in Thailand. *Id.* Consequently, because of the unusual circumstances under which the merchandise entered Singapore's commerce, Commerce considered the sales as third country sales and excluded them from NMB/Pelmec's home market database. *Id.* at 35.

Torrington contends that Commerce failed to sufficiently explain why it changed its finding with respect to Route B sales and that the Remand Results failed to adequately cite to the administrative record. *Torrington's Comments* at 8–10.

The Court finds Commerce's explanation on remand reasonable and fully supported by the administrative record. Unlike the transaction at issue in the LTFV investigation, the Route B sales here never entered the commerce of Singapore, and so, are home market sales. Indeed, as NMB/Pelmec points out,

record evidence shows that all Route B sales in this investigation were made to customers in Thailand. *Rebuttal Comment of NMB/Pelmec to Torrington's Comments on the Remand Results* at 6 (citing *Response of NMB/Pelmec Thai to Section A of the Questionnaire*, P.R. Document No. 20, Fiche 2, Frame 18). Hence, in accordance with *Torrington*, 20 CIT at ——, 926 F.Supp. at 1162, the Court sustains Commerce's decision to include the Route B sales at issue in the home market analysis.

### 3. Certain SKF Cash Discounts and Billing Adjustments

In the Final Results, Commerce allowed certain post-sale price adjustment allocations as indirect selling expenses for several companies. Among the adjustments that Commerce allowed were the post-sale billing adjustments that SKF–Germany, SKF–Sweden and SKF–Italy granted to their customers. *Final Results*, 58 Fed.Reg. at 39,760. This Court instructed Commerce, upon remand, to develop a methodology that removes discounts paid on sales of out-of-scope merchandise from any adjustments made to foreign market value for post-sale price adjustments or, if no viable methodology could be developed, to deny such an adjustment in the calculation of each company's foreign market value. *Federal–Mogul*, 20 CIT at ——, 918 F.Supp. at 408.

Commerce found, upon remand, that the SKF companies did not record their billing adjustments on a transaction-specific basis but, rather, in a single account allocating them to both subject and non-subject merchandise. *Remand Results* at 22. Hence, Commerce denied the adjustments. *Id.* Commerce notes that it interpreted the remand instructions in accordance with *Torrington Co. v. United States*, 82 F.3d 1039, 1047–51 (Fed.Cir.1996), which held that Commerce should disallow all billing adjustments where adjustments on non-scope merchandise could not be removed from the reported amounts. *Id.* at 23. Torrington agrees that Commerce correctly denied the post-sale price adjustments. *See Torrington's Rebuttal* at 1–6.

SKF argues that Commerce improperly disallowed certain SKF cash discounts and billing adjustments that were·not challenged by Torrington and were not expressly included in the scope of Commerce's remand.[5] *SKF's Comments* at 3–19.

The Court finds Commerce's exclusion of all billing adjustments where adjustments on non-scope merchandise could not be removed from the reported amounts reasonable and in accordance with law. Commerce did not exceed the scope of the remand order, which broadly encompassed *all* post-sale price adjustments and rebates. *See Federal–Mogul,* 20 CIT at ——, ——, 918 F.Supp. at 408, 421. Hence, pursuant to *Torrington,* 82 F.3d at 1047–51, Commerce properly excluded the post-sale price adjustments. Consequently, Commerce's decision to exclude all post-sale price adjustments in this case is sustained.

### 4. *Recalculation of Inventory Carrying Costs*

■ This Court granted Commerce's request for a remand to reconsider its methodology for computing inventory carrying costs. *See Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 399.

Commerce concluded upon remand that the inventory carrying cost formula used by NTN was not reasonable and recalculated the inventory carrying costs for NTN. *See Remand Results* at 14–15. In particular, Commerce found that NTN's methodology dramatically overstated its home market inventory carrying costs because such costs were incorrectly based on inventory values without consideration of inventory turnover rates. *Id.* at 14–15. Hence, Commerce recalculated NTN's inventory factor by taking into account NTN's reported inventory turnover rate. *Id.* at 15. Commerce further found that, because NTN's inventory values were cost-based, consistency in the carrying

cost calculation required Commerce to apply the recalculated cost-based inventory factor to NTN's unit cost. *Id.* at 8–14.

NTN objects to Commerce's recalculation of NTN's inventory carrying expenses, arguing that Commerce based its recalculation on an inaccurate understanding of the methodology used by NTN. *NTN's Comments* at 1–2. NTN claims that it calculated a total amount representing the imputed inventory carrying cost, and then divided that amount by total sales to arrive at the inventory carrying cost factor. *Id.* at 2. Further, NTN argues that it did not overstate the costs at issue because the total amount allocated to sales does not change, regardless of whether it is allocated based on sales value or cost of production. *Id.*

Upon review of the record, the Court finds that Commerce's methodology is reasonable and that Commerce properly recalculated NTN's inventory carrying costs.[6] Consequently, Commerce's decision to recalculate NTN's inventory carrying costs is sustained.

### 5. *Aftermarket Level of Trade*

■ Pursuant to its regulations, Commerce "calculate[s] foreign market value and United States price based on sales [made] at the same commercial level of trade." 19 C.F.R. § 353.58 (1994). In the Final Results, Commerce recognized three distinct commercial levels of trade for NTN: original equipment manufacturers, distributors and aftermarket customers. *Final Results,* 58 Fed. Reg.·at 39,767. This Court found that Commerce prematurely recognized the·aftermarket level and issued a remand for Commerce to determine whether NTN satisfied its burden of proving that there were different selling expenses between the aftermarket level and the·two other levels. *Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 415.

---

5. SKF further asserts that Commerce's decision to allow SKF's rebates and cash discounts as adjustments in its Final Results became final when the time to appeal the decision expired without the issue being raised. *SKF's Comments* at 9–16. However, this Court allowed Commerce to reconsider its approach with respect to *all* post-sale price adjustments in light of *Torrington Co. v. United States,* 17 CIT 199, 218, 818 F.Supp. 1563, 1578–79 (1993). *See Federal–*

*Mogul,* 20 CIT at ——, 918 F.Supp. at 408. Hence, Commerce's Final Results decision on the matter had not become final.

6. Indeed, NTN does not dispute either of Commerce's adjustments to NTN's inventory carrying costs but, rather, merely asserts that Commerce mischaracterized NTN's original calculation.

 To determine the number of a respondent's levels of trade, Commerce performs a "functional test," in which it examines the type of customers and customer functions, as reported by the respondent and subsequently verified, and arrives at an economic presumption that net prices and selling expenses are different at each level of trade. *See Laclede Steel Co. v. United States,* 18 CIT 965, 977, 1994 WL 591949 (1994). When a party contests the recognition of the levels of trade established by the functional test, Commerce performs a "correlation test," in which the rebutting party presents information showing that there is no correlation between prices and selling expenses, and the levels of trade. *Id.*

In *Federal–Mogul,* this Court concluded that Commerce was to examine not only NTN's price expenses, but also NTN's selling expenses before determining the discernible levels of trade that exist. 20 CIT at ——, 918 F.Supp. at 415 (citing *Import Administration Policy Bulletin 92/1,* July 29, 1992) ("Policy Bulletin"). Commerce and NTN contend that the Court misconstrued the Policy Bulletin test by requiring NTN to supply selling information when, in fact, such information is only required from a party challenging the results of the functional test. *Remand Results* at 29–33; *NTN's Comments* at 3.

 Upon reconsideration, the Court notes that a proper interpretation of the Policy Bulletin mandates that NTN was not required to provide any analysis beyond the functional test unless it wished to rebut the economic presumption. The party *opposing* a level of trade classification, in this case Torrington, has the burden to provide a factual basis for rebutting the economic presumption by demonstrating that prices and selling expenses are not correlated to levels of trade. *See Laclede,* 18 CIT at 977; *see also Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 16 CIT 1008, 1010, 808 F.Supp. 841, 844 (1992), *rev'd on other grounds,* 13 F.3d 398 (Fed.Cir.1994).

In this case, NTN established an economic presumption under the Policy Bulletin test that an aftermarket level of trade exists and Torrington failed to provide Commerce with sufficient evidence to rebut the presumption. *See Final Results,* 58 Fed.Reg. at 39,767. Consequently, the Final Results conclusion that aftermarket is a distinct level of trade for NTN sales is sustained.

The Department of Commerce, International Trade Administration ("Commerce"), having submitted its *Final Results of Redetermination Pursuant to Remand* ("Remand Results"), in accordance with *Federal–Mogul Corp. v. United States,* 20 CIT ——, 918 F.Supp. 386 (1996), and the Court having examined all comments filed regarding Commerce's Remand Results, it is hereby

**ORDERED** that plaintiff and plaintiff-intervenor's and defendant-intervenors' requests for an order directing Commerce to issue a second redetermination is denied; and it is further

**ORDERED** that, upon reconsideration, pursuant to Commerce's *Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order,* 58 Fed.Reg. 39,729, 39,767 (1993), Commerce is to treat aftermarket as a distinct level of trade for NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH sales; and it is further

**ORDERED** that Commerce's Remand Results are affirmed in all other respects; and it is further

**ORDERED** that since all other issues have been decided, this case is dismissed.

