**Slip Op. 99-71**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

| | |
|---|---|
| NTN BEARING CORP. OF AMERICA, NTN CORPORATION, AMERICAN NTN BEARING MFG. CORP., NTN DRIVESHAFT, INC. and NTN-BOWER CORPORATION, | : <br> : <br> : <br> : <br> : |
| Plaintiffs and Defendant-Intervenors, | : <br> : <br> : |
| v. | : Consolidated Court <br> : No. 97-01-00092 |
| UNITED STATES, | : <br> : |
| Defendant, | : <br> : |
| KOYO SEIKO CO., LTD. and KOYO CORPORATION of U.S.A.; NSK LTD. and NSK CORPORATION, | : <br> : <br> : |
| Defendant-Intervenors, | : <br> : |
| THE TORRINGTON COMPANY, | : <br> : |
| Defendant-Intervenor and Plaintiff. | : <br> : <br> : |

Plaintiffs, The Torrington Company ("Torrington") and NTN Bearing Corp. of America, NTN Corporation, American NTN Bearing Mfg. Corp., NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN") have filed separate motions for judgment on the agency record pursuant to Rule 56.2 of the rules of this Court contesting various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final results of the fifth administrative review, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews</u>, 61 Fed. Reg. 66,472 (Dec. 17, 1996).

Torrington challenges (1) Commerce's acceptance of a foreign importer's deduction of imputed interest expenses on antidumping duty cash deposits from total indirect selling expenses; and (2) Commerce's determination to grant certain allocated discounts and

post-sale price adjustments to importers' home market price calculations.

NTN challenges the following actions by Commerce: the inclusion of (1) home market sales of sample merchandise and (2) sales allegedly not in the ordinary course of trade in its foreign market value ("FMV") calculation; (3) the determination not to make a circumstance of sale adjustment based on the difference in prices at different levels of trade; (4) the determination to allocate selling expenses over total sales without regard to level of trade in calculating both United States and home market price; (5) the determination to exclude related party sales in calculating FMV; and (6) the reallocation of U.S. selling expenses based upon the sale price to the first unrelated purchaser.

**Held:** Torrington's motion is denied.  NTN's motion is granted in part and denied in part.  Case is remanded for Commerce to: (1) review the record to determine whether it is possible to isolate and remove the portions of Koyo's warranty expenses which relate to non-scope merchandise from the adjustments to FMV or, in the alternative, to deny the adjustment if such an apportionment cannot be made; and (2) exclude any sample transactions unsupported by consideration.  Commerce is affirmed in all other respects.

[Torrington's motion is denied.  NTN's motion is granted in part and denied in part.  Case remanded.]

Dated: July 29, 1999

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano and Christine H.T. Yang) for NTN Bearing Corp. of America, NTN Corporation, American NTN Bearing Mfg. Corp., NTN Driveshaft, Inc, and NTN-Bower Corporation.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis, Assistant Director); Of counsel: Mark A. Barnett, Myles S. Getlan and Sanjay J. Mullick, Attorney-Advisors, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Powell, Goldstein, Frazer & Murphy LLP, (Peter O. Suchman, Neil R. Ellis and Elizabeth C. Hafner) for Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

Lipstein, Jaffe & Lawson, LLP (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for NSK Ltd. and NSK Corporation.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for The Torrington Company.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs, The Torrington Company ("Torrington"), NTN Bearing Corp. of America, NTN Corporation, American NTN Bearing Mfg. Corp., NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN"), have filed separate motions for judgment on the agency record pursuant to Rule 56.2 of the rules of this Court contesting various aspects of the final results of the fifth administrative review (from May 1, 1993, through April 30, 1994).

## Background

This case concerns antifriction bearings ("AFBs") and parts thereof from Japan. Commerce published the antidumping duty order covering AFBs from Japan on May 15, 1989. See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan, 54 Fed. Reg. 20,904. On December 7, 1995, Commerce published the preliminary results of the fifth review under the Order entitled, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Japan, Singapore, Sweden, Thailand, and the United

Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Notice of Intent to Revoke Order, 60 Fed. Reg. 62,817.  On December 17, 1996, Commerce published its final results of the subject review. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews ("Final Results"), 61 Fed. Reg. 66,472, as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews, 62 Fed. Reg. 149 (Jan. 2, 1997), Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Germany, Italy, Japan, and the United Kingdom: Amended Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 3,003 (Jan. 21, 1997).[1]

---

[1]  Because the reviews in this case were initiated prior to January 1, 1995, the applicable law is the antidumping statute as it existed prior to the amendments made by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

Discussion

The Court has jurisdiction in this case pursuant to 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."  Timken Co. v. United States, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), aff'd, 894 F.2d 385 (Fed. Cir. 1990).

A. Torrington's Issues

1.  Abandoned Claims

As a preliminary matter, the Court notes that in addition to the claims raised below, Torrington also challenged (1) Commerce's failure to apply the reimbursement regulation in instances where transfer prices were less than cost plus profit and actual dumping

margins were found, and (2) Commerce's inclusion of below-cost sales in calculating constructed value. <u>See</u> Torrington's Mem. Supp. J. Agency R. at 42-56. However, Torrington has abandoned these two claims in light of <u>Torrington Co. v. United States</u>, 127 F.3d 1077 (Fed. Cir. 1997). <u>See</u> Letter from Torrington (Stewart & Stewart) to the Clerk of the Court (Nov. 6, 1997).

As a consequence of Torrington's abandonment of these counts, and pursuant to the Court of Appeals decision in <u>Torrington</u>, 127 F.3d 1077, the Court affirms Commerce's calculation of profit for constructed value and its determination to refrain from applying the reimbursement regulation in this case.

## 2. <u>Deduction of Imputed Interest Expenses on Antidumping Duty Cash Deposits From Indirect Selling Expenses</u>

In the <u>Final Results</u>, Commerce permitted Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo") to deduct imputed interest expenses on antidumping duty deposits from Koyo's United States indirect selling expenses. <u>Final Results</u>, 61 Fed. Reg. at 66,488-89.

Torrington argues that Commerce's deduction encourages companies to dump by providing a larger offset as the antidumping duty deposit becomes greater. Further, Torrington claims that Commerce's determination contradicts its most recent practice in

the seventh review.  Torrington requests that the Court remand this issue to Commerce with instructions to deny such claims or, in the alternative, to explain its departure from its prior practice. Torrington's Mem. Supp. J. Agency R. at 15-22.

Commerce maintains that neither the statute nor the legislative history prohibits this adjustment to indirect selling expenses.  Commerce further asserts that by deducting imputed interest on antidumping duty deposits, it followed its practice of the third and fourth reviews, which were sustained by this Court in NSK Ltd. v. United States, 21 CIT ___, 969 F. Supp. 34 (1997), and Federal-Mogul Corp. v. United States, 20 CIT 234, 918 F. Supp. 386 (1996).  Although Commerce acknowledges a recent change in its position regarding imputed interest in the seventh review, it argues that the new position has no retroactive application. Commerce's Partial Opp'n to Mots. J. Agency R. at 40-45.

Koyo argues that Federal-Mogul Corp. v. United States, 20 CIT 1438, 1440-41, 950 F. Supp. 1179, 1182-83 (1996), supports Commerce's treatment of its imputed interest expenses.  Koyo Opp'n to Torrington's Mot. J. Agency R. at 6.  Koyo further asserts that Commerce's subsequent practices do not affect the results of the subject review.  Id. at 8.

This Court has consistently upheld the adjustment to indirect selling expenses when Commerce has granted it, and has remanded to

Commerce to allow the adjustment when Commerce denied it in the final results.  See Timken Co. v. United States, 21 CIT ___, ___, 989 F. Supp. 234, 250 (1997) (remanding for Commerce to grant adjustment); NSK, 21 CIT at ___, 969 F. Supp. at 55 (same); Federal-Mogul, 20 CIT at 1440-41, 950 F. Supp. at 1182-83 (upholding Commerce's decision to grant adjustment).

In accordance with this Court's well-established position, see Timken Co. v. United States, 22 CIT ___, ___, 16 F. Supp. 2d 1102, 1104 (1998), the Court holds that Commerce's determination to grant an adjustment to indirect selling expenses for imputed interest payments incurred in financing antidumping duty cash deposits is supported by substantial evidence and is in accordance with law.

3.  Allocated Discounts, Post-Sale Price Adjustments and Billing Adjustments in FMV Calculations

In the fifth review, Commerce generally made direct adjustments to foreign market value ("FMV") for discounts, rebates and price adjustments if they were either reported on a transaction specific basis or were granted as a fixed percentage of sales price on each transaction (such as a fixed percentage rebate program or an early-payment discount granted on the total price of a pool of sales).  Final Results, 61 Fed. Reg. 66,498.

a. NTN's Billing Adjustments

As one of the adjustments, Commerce granted NTN's reported billing adjustments to home market sales prices. Commerce found that the great majority of NTN's adjustments were transaction specific and determined that the instances of non-transaction specific reporting were so few as to not render the billing adjustments distortive. Commerce therefore treated all of NTN's reported home market billing adjustments as direct adjustments to FMV in the Final Results. 61 Fed. Reg. 66,501.

Torrington argues that Commerce erred by treating NTN's home market billing adjustments as direct expenses with which to adjust FMV. Torrington asserts that home market billing adjustments can be used as a direct adjustment only if reported on a transaction specific basis, not on groups of sales (i.e., in a non-transaction specific manner) as NTN reported its billing adjustments. Torrington's Reply Supp. J. Agency R. at 7-9. According to Torrington, Commerce's decision to accept discounts as direct deductions to FMV conflicts with Torrington Co. v. United States, 82 F.3d 1039 (Fed. Cir. 1996). Torrington asks for a remand so that Commerce may adjust FMV only for billing adjustments reported on a transaction specific basis and deny the adjustment where reported otherwise. Id. at 10.

NTN asserts that Torrington's arguments regarding NTN's non-transaction specific home market billing adjustments are meritless because the majority of its adjustments were transaction specific. NTN asserts that the instances of non-transaction specific reporting did not have any impact on the calculation of FMV and consequently, did not affect NTN's dumping margin. NTN's Mem. Opp'n Torrington's Mot. J. Agency R. at 5-8.

Sections 1677a and 1677b require Commerce to determine the price actually charged to a customer both in the home market (FMV) and in the United States (USP) for the merchandise at issue. See 19 U.S.C. §§ 1677a, 1677b (1988). The actual price charged to a customer necessarily includes adjustments for discounts or rebates paid by the company to the customer. The issue here is whether Commerce may accept NTN's billing adjustments as direct adjustments to FMV where most, but not all, of the adjustments were granted on a transaction specific basis.

For Commerce to allow an adjustment to FMV for discounts and price adjustments under sections 1677a and 1677b, Commerce must first determine what type of adjustment is being sought (direct or indirect) and then determine whether the adjustment sought is calculated and recorded in the manner required for its type. A direct expense applied as an adjustment to FMV is inherently an expense which either varies with the quantity sold, Zenith Elecs.

Corp. v. United States, 77 F.3d 426, 431 (Fed. Cir. 1996), or is "related to a particular sale." Torrington, 68 F.3d at 1353. The billing adjustment NTN seeks is an expense, which by its nature, is direct. The direct adjustment sought by NTN must, therefore, be reported in a manner appropriate for direct adjustments before Commerce may grant the adjustment to FMV.

To ensure that the exporter's claimed adjustments reflect actual disounts and rebates paid only on the subject merchandise, Commerce generally requires that these adjustments be reported on a transaction specific basis or be based on a fixed and constant percentage of sales price on all transactions reported. Final Results, 61 Fed. Reg. at 66,498. However, this Court has held that "[t]he relevant issue regarding direct adjustments is ultimately not whether they were reported on a transaction specific basis, but whether a respondent can demonstrate that its adjustments were not made over non-subject merchandise." NSK, 21 CIT at __, 969 F. Supp. at 47 (citing Federal-Mogul, 20 CIT at 1443, 950 F. Supp. at 1184-85).

The crux of the issue, therefore, is whether Commerce's determination that NTN's billing adjustments reported on a non-transaction specific basis were made solely over in-scope merchandise was reasonable. If Commerce reasonably determined that

the adjustment pertained only to subject merchandise, then the Court must uphold Commerce's determination.

Although NTN bases its argument that the adjustment should be upheld because there were only a few instances of non-transaction specific reporting, the record reveals that the Court should uphold the adjustment on other grounds. After careful review of the confidential record, the Court concludes that for the few instances of non-transaction specific reporting, NTN was able to tie the adjustment directly to in-scope merchandise, specifically, to product code and model number. Commerce's granting of the adjustment was therefore reasonable and in accordance with law.

b.  <u>NSK's Home Market Early Payment Discounts</u>

NSK grants rebates, in the form of early payment discounts, to its distributors if the distributors resell the bearings to certain customers approved in advance by NSK. Commerce allowed the early payment discounts as a direct adjustment to FMV because the discounts were granted as a fixed percentage of all purchases by a given customer. <u>Final Results</u>, 61 Fed. Reg. at 66,500-01.

Torrington claims that NSK's reporting method of dividing early payment discounts granted to a customer by the customer's total payments to obtain a customer-specific early payment discount factor for the period of review is distortive. Torrington argues

that actual early payment discounts are granted on a month-by-month basis, not as NSK reported them. Finally, Torrington asserts that under <u>Torrington</u>, 82 F.3d at 1050-51, Commerce cannot treat expenses directly related to particular sales as indirect selling expenses to be deducted from FMV as part of an exporter's sales price offset. Torrington's Reply Supp. Mot. J. Agency R. at 14-15.

NSK argues that its early payment discounts are a fixed percentage of total discounts and, therefore, they qualify as a direct adjustment to price. NSK acknowledges that Commerce prefers that discounts be reported on an invoice-specific basis, but asserts that such reporting was not possible in this case, because NSK does not issue invoices for each shipment in the home market. However, NSK argues that there is ample evidence on the record revealing how the early payment discount is earned, recorded and reported which conclusively demonstrates that the early payment discount applied equally to scope and non-scope merchandise and is a fixed percentage across all sales. NSK's Opp'n to Torrington's Mot. J. Agency R. at 4-8.

The Court agrees with Commerce and NSK. Torrington erroneously emphasizes form over substance. By arguing that Commerce should solely consider the method of recording and allocation of the expenses instead of the calculation of expenses, Torrington ignores well-established law. Although Commerce

generally requires transaction specific reporting before granting adjustments to FMV for early payment discounts, Commerce will also allow an adjustment if the adjustment is based on a fixed and constant percentage of sales price on all transactions reported. As discussed above, these two methods, approved by Commerce and the Courts, ensure that the adjustment is granted for in-scope merchandise only. Commerce's decision to allow the adjustment where NSK demonstrated that the early payment discount was granted across all sales is in conformity with Commerce's approved practice. Accordingly, because Commerce's method accurately determined that the adjustment was attributable to early payment discounts on the subject merchandise, Commerce is affirmed.

### c. Koyo's Home Market Warranty Expenses

In the Final Results, Commerce accepted Koyo's home market warranty expenses as direct expenses. 61 Fed. Reg at 66,485.

Commerce asserts that, upon review of the record, it cannot determine the extent to which Koyo granted its reported warranty expenses on subject merchandise. Commerce, therefore, asks for a remand with respect to Koyo's warranty expenses. Commerce's Partial Opp'n Mots. J. Agency R. at 56-57.

Torrington contends that in accepting Koyo's home market warranty expenses as direct selling expenses, Commerce improperly

allowed Koyo to allocate expenses which should have been reported on a transaction specific basis. Torrington's Mem. Supp. J. Agency R. at 40-47.

Although Koyo recognizes that this Court has already decided this issue against Koyo in NSK, 21 CIT __, 969 F. Supp. 34, Koyo asks that the Court reconsider its decision in NSK and affirm Commerce's acceptance of Koyo's warranty expenses in the Final Results. Koyo's Opp'n to Torrington's Mot. J. Agency R. at 5-6. Koyo also argues that even though its warranty expenses were allocated over a pool of products that may not all have been within the scope of the AFB antidumping order, virtually all products were within the scope of one of the three outstanding orders against Koyo's products. Id. at 6 (incorporating by reference Koyo's Response to Torrington's Mot. J. Agency R. at 15-16, filed in NSK, 21 CIT ___, 969 F. Supp. 34 (dated Apr. 19, 1996)).

The Court declines to revisit its opinion in NSK, 21 CIT ___, 969 F. Supp. 34. Pursuant to that decision, the Court grants Commerce's request for a remand so that Commerce may review the record to determine whether it is possible to isolate and remove the portions of Koyo's warranty expenses which relate to non-scope merchandise from the adjustments to FMV or to deny the adjustment if such a distinction and apportionment cannot be made.

B.  NTN's Issues

1. Inclusion of NTN's Home Market Sales of Sample Merchandise in Calculating FMV

In the Final Results, Commerce determined that certain NTN sample sales in the home market were not outside the ordinary course of trade.  Commerce, therefore, included these sales in the calculation of FMV.  61 Fed. Reg. at 66,513-14.

a. Inclusion of Low-volume Sales in Calculating FMV

In the Final Results, Commerce determined that:

NTN's standard of "low volume of sales" is inadequate as a definition of sales not in the ordinary course of trade.  NTN has presented no other supporting information that identifies a low-volume sale as outside the ordinary course of trade. [Commerce] has determined that "infrequent sales of small quantities of certain models is insufficient evidence to establish that sales were made outside the ordinary course of trade."

Final Results, 61 Fed. Reg. at 66,514.  Commerce asserts that its inclusion of certain transactions labeled by NTN as "samples" should be sustained.

NTN argues that all its sales labeled as "sample sales" should have been excluded from the FMV calculation.  NTN asserts that samples sales were designated as such for valid business reasons and that, inherently, these reasons remove the sample sales from the ordinary course of trade.  NTN's Mem. Supp. Mot. J. Agency R. at 8-12.  Specifically, NTN argues that Commerce should have

excluded sales with an "extremely sporadic sales history" from its
FMV calculations because such sales are outside the ordinary course
of trade.

Commerce responds that NTN's argument is based on a confusion
of certain trade law realities. Commerce argues that NTN is using
the phrase "usual commercial quantities" and "ordinary course of
trade" interchangeably, even though they are distinct concepts,
separately defined under different statutes. For example, Commerce
explains, although both concepts pertain to the calculation of FMV,
a company may be denied a claim to exclude sales outside the
ordinary course of trade, but still receive an adjustment for sales
that are not in the usual commercial quantities. In addition,
Commerce argues that NTN never claimed during the administrative
proceedings, as required, that its sales were not in the "usual
commercial quantities." Further, Commerce points out that NTN does
not claim that any correlation exists between the price and
quantity of the sales at issue, which Commerce requires before
determining a specific price with which to calculate FMV.
Commerce's Partial Opp'n Mots. J. Agency R. at 18-19.

Torrington agrees with Commerce and asserts that a low volume
of sales, by itself, does not establish that the sale is outside
the ordinary course of trade. Further, Torrington argues that NTN
did not meet its burden of proving that its sample sales are

outside the ordinary course of trade, and that, therefore, Commerce properly included NTN sample sales in calculating FMV. Torrington's Opp'n to Mot. J. Agency R. at 11-15.  In addition, Torrington argues that the Court has already rejected NTN's argument.  Torrington's Opp'n to Mot. J. Agency R. at 16-17.

The Court agrees with Commerce and Torrington.  The statute defines FMV as the price "at which such or similar merchandise is sold . . . in the usual commercial quantities and in the ordinary course of trade for home consumption."  19 U.S.C. § 1677b(a)(1)(A). "The term 'ordinary course of trade' means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind."  19 U.S. C. § 1677(15).  In determining whether a sale is outside the ordinary course of trade, Commerce must consider "all the circumstances particular to the sales in question."  Cemex, S.A. v. United States, 133 F.3d 897, 900 (1988) (quoting Murata Mfg. Co. v. United States, 17 CIT 259, 264, 820 F. Supp. 603, 607 (1993)); see also Thai Pineapple Public Co. v. United States, 20 CIT 1312, 1314, 946 F. Supp. 11, 15 (1996).  "An analysis of these factors should be guided by the purpose of the ordinary course of trade provision which is to prevent dumping margins from being based on sales which are not representative of the home market."  Cemex, 133 F.3d at 900 (internal quotations

omitted).    The factors Commerce may consider in its analysis include:   home market demand, volume of home market sales, sales quantity, sales price, profitability, customers, terms of sale and frequency of sales.  See, e.g., Thai Pineapple, 20 CIT at 1315, 946 F. Supp. at 16; see also Cemex, S.A. v. United States, 19 CIT 587, 589-593 (1995).   "In sum, ordinary course of trade is determined on a case-by-case basis by examining all of the relevant facts and circumstances."   Cemex, 19 CIT at 593.

Plaintiff has the burden of proving whether the sales used in Commerce's calculations are outside the ordinary course of trade. See, e.g., Nacho-Fujikoshi Corp. v. United States, 16 CIT 606, 608, 798 F. Supp. 716, 718 (1992) (citing Koyo Seiko Co. v. United States, 16 CIT 539, 543, 796 F. Supp. 1526, 1530 (1992)).

NTN argues that because it designated certain sales under the variable "sample" in its accounting that those transactions were outside the ordinary course of trade and, therefore, should be excluded from NTN's home market database prior to calculating weighted average prices for FMV.  NTN's Mot. J. Agency R. at 9. However, a party's mere designation of certain transactions as "sample sales" is not sufficient to meet plaintiff's burden of proof.

In NTN Bearing Corp. v. United States, 19 CIT 1221, 1227-29, 905 F. Supp. 1083, 1089-91 (1995), the Court held that sales that

are infrequent are not necessarily outside the "ordinary course of trade." The Court found that "[w]ithout a complete explanation of the facts which establish the extraordinary circumstances rendering particular sales outside the ordinary course of trade, Commerce cannot exclude those sales from FMV." NTN, 19 CIT at 1229, 905 F. Supp. at 1091.

In this case, Commerce requested from NTN detailed information regarding sales that NTN claimed were outside the ordinary course of trade. In response, NTN merely described the methodology it used to identify low-volume sales. As discussed in NTN, 19 CIT at 1227-29, 905 F. Supp. at 1089-91, this alone is not sufficient to support the exclusion of these low-volume sales from NTN's FMV calculations. In its final determination, Commerce reasonably determined that NTN failed to meet its burden of proving that the sales used in Commerce's calculations are outside the ordinary course of trade. The Court therefore upholds Commerce's determination to include non-zero priced low-volume sample sales in NTN's home market database when calculating the FMV of NTN's AFBs.

### b. Zero-Priced Transactions

The transactions which NTN identified during the review as sample sales included some transactions which occurred for a price of zero. A zero-priced transaction does not qualify as a "sale" and, therefore, by definition cannot be included in Commerce's FMV

calculation. See <u>NSK Ltd. v. United States</u>, 115 F.3d 965, 975 (1997) (holding that the term "sold" requires both a transfer of ownership to an unrelated party and consideration).

Consequently, in light of <u>NSK</u>, the Court remands to Commerce to exclude any sample transactions unsupported by consideration from NTN's FMV calculations.

2. <u>Circumstance of Sales Adjustment Based on Differences in Prices at Different Trade Levels</u>

NTN reported sales at different levels of trade in the home market. <u>Final Results</u>, 61 Fed. Reg. at 66,508. During the review, NTN requested that Commerce make a price-based level of trade ("LOT") adjustment when U.S. sales were matched to home market sales across different levels of trade. Commerce denied a LOT adjustment based upon differences in prices, stating the following:

> [R]espondents must quantify any price differentials that are directly attributable to differences in levels of trade. During the course of this administrative review, NTN made no attempt to quantify the degree to which differences in prices were attributable wholly or partly to differences in levels of trade.

<u>Final Results</u>, 61 Fed. Reg. at 66,508 (internal quotations omitted).

NTN argues that it provided evidence which supported a LOT adjustment and asks that the Court remand so that Commerce could state its reasons for its refusal to make an adjustment and specify

what proof Commerce needs to quantify a LOT adjustment for NTN. NTN's Mem. Supp. Mot. J. Agency R. at 13-16. NTN acknowledges that this Court has rejected its argument regarding a LOT adjustment in previous cases but asks the Court to reconsider the issue. Id. at 16. Torrington agrees with Commerce's determination that NTN did not submit information sufficient to support a LOT adjustment.

A careful review of the record indicates that NTN submitted some evidence of varying costs and expenses across different LOTs. Nonetheless, the Court upholds Commerce's determination to deny an LOT adjustment, because NTN failed to show how LOTs account for the differences in price which NTN reported. Although NTN argues that "these distinctions in cost readily relate to the differences in price," see NTN's Mem. Supp. J. Agency R. at 14, NTN did not demonstrate how the differences in cost and in price were attributed to LOT. A mere declaration that the differences exist is insufficient to grant a LOT adjustment.

"This Court has consistently upheld a denial of a level of trade adjustment where a respondent has failed to demonstrate that differences in price were directly attributable to differences in level of trade." Timken Co. v. United States, 21 CIT ___, Slip Op. 97-87 at 10 (July 3, 1997) (citing Koyo Seiko Co. v. United States, 20 CIT 772, 777, 932 F. Supp. 1488, 1493 (1996), NTN Bearing Corp., 19 CIT at 1232-33, 905 F. Supp. at 1094-95, NTN Bearing Corp. of

Am. v. United States, 17 CIT 1149, 1154, 835 F. Supp. 646, 650 (1993)).  In addition, the Court has upheld the denial of price-based LOT adjustments where the party "merely indicated variances in prices and selling expenses at the different levels of trade, without illustrating the factors to which they were attributable." NSK, 21 CIT at ___, 969 F. Supp. at 53.  Therefore, the Court finds that Commerce's denial of a price-based LOT adjustment in this case is supported by substantial evidence and is in accordance with law.


3.  <u>Reallocation of NTN's Selling Expenses Without Level of Trade Adjustment Based on Indirect Selling Expenses</u>

In the <u>Final Results</u> Commerce determined that the methods NTN used for allocating its indirect selling expenses did not bear any relationship to the manner in which NTN incurred the expenses, leading to distorted allocations.  Commerce further determined that NTN's allocations according to LOT were misplaced and that NTN could not conclusively demonstrate that its indirect selling expenses vary across LOTs.  Because Commerce found that NTN did not provide sufficient evidence demonstrating that selling expenses are attributable to trade levels, Commerce recalculated NTN's expenses to represent selling expenses for all home market sales in the <u>Final Results</u>.  61 Fed. Reg. at 66,489.  Torrington supports Commerce and argues that NTN has not distinguished the current

review from previous reviews in which the Court affirmed Commerce's reallocation method.

NTN argues that it submitted evidence that unequivocally established that NTN incurred different selling expenses at different trade levels.  NTN's Mem. Supp. J. Agency R. at 17. Accordingly, NTN argues that Commerce should have accepted its allocation of U.S. and home market indirect selling expenses. Although NTN recognizes that the Court decided against it when considering a similar issue concerning the level of trade adjustment, NTN argues that the facts of this case are materially different from those of the previous review.  Id. at 18.

A careful review of the record[2] indicates that NTN's method of allocating U.S. indirect expenses did not substantiate its claim that its selling expenses are attributable to different LOTs.  In fact, in some instances, NTN even failed to demonstrate that its indirect selling expenses varied at all across LOTs.  The Court therefore affirms Commerce in this respect.

---

[2]  This includes the confidential record describing in depth NTN's method for allocating expenses.

4. <u>Exclusion of NTN's Home Market Sales to Related Parties in</u>
   <u>Calculating FMV</u>

    Commerce excluded NTN's home market sales to related parties
in calculating FMV.    <u>Final Results</u>, 61 Fed. Reg. at 66,511.
Commerce asserts that it properly exercised its discretion and
excluded NTN's related party sales in calculating FMV when
Commerce's test disclosed that, on average, NTN's prices to related
parties were lower that its prices to unrelated parties.
Commerce's Partial Opp'n Mots. J. Agency R. at 30-37.

    NTN argues that Commerce's method of determining whether NTN's
related party sales were at arm's length was improper.  According
to NTN, Commerce should not have discarded NTN's related party
sales without first examining other factors in addition to price,
such as, the terms and the quantities of each related party sale,
because those factors influence price.  NTN believes that the
consideration of additional factors is necessary to determine
whether related party sales are "comparable" to sales to unrelated
party's under Commerce's regulation 19 C.F.R. § 353.45.  NTN's Mem.
Supp. J. Agency R. at 18-19.  NTN further objects to Commerce's use
of a weighted average approach to determine whether related party
prices are comparable to unrelated party prices.  According to NTN,
Commerce's weighted average methodology is unreasonable because it
does not accurately reflect the price levels to unrelated and
related parties for part number in the same class or kind.

Although NTN recognizes that this Court has affirmed Commerce's decision to exclude related party sales in <u>NSK</u>, 21 CIT ___, 969 F. Supp. 34, and <u>NTN</u>, 19 CIT 1221, 905 F. Supp. 1083, NTN asks that the Court remand for Commerce to revise its test for determining whether related party sales were made at prices comparable to unrelated party sales. NTN's Mem. Supp. J. Agency R. at 18-21.

Torrington supports Commerce exclusion of NTN's related party sales from the calculation of FMV. In addition, Torrington asserts that Commerce has the authority to exclude related party sales, unless Commerce is satisfied with the price. Torrington also asserts that NTN has not demonstrated that Commerce's determination was unreasonable.

According to 19 U.S.C. § 1677b(3):

> If such or similar merchandise is sold or, in the absence of sales, offered for sale through a sales agency or other organization related to the seller . . . , the prices at which such or similar merchandise is sold . . . . may be used in determining the foreign market value.

Because the statute is silent as to when Commerce should use related-party sales in calculating FMV, Commerce has broad discretion to make that determination. <u>See</u>, <u>Chevron U.S.A. Inc. v. National Resources Defense Council</u>, 467 U.S. 837, 842-43 (1984).

Commerce's relevant regulation, 19 C.F.R. § 353.45, provides that:

> If a producer or reseller sold such or similar merchandise to a person related as described in [19 U.S.C. § 1677(13)], [Commerce] ordinarily will calculate foreign market value based on that sale only if satisfied that the price is comparable to the price at which the producer or reseller sold such or similar merchandise to a person not related to the seller.

Accordingly, there is a strong presumption that Commerce will not use a related-party price in the calculation of FMV "unless the manufacturer demonstrates to Commerce's satisfaction that the prices are at arm's length."  SSAB Svenskt Stal AB v. United States, 21 CIT ___, ___, 976 F. Supp. 1027, 1030 (1997).

NTN concedes that, in general, prices to related parties were lower than prices to unrelated parties.  Further, NTN failed to show why Commerce's reliance on price is unreasonable. See NTN, 19 CIT at 1242, 905 F. Supp. at 1100 (rejecting the assertion that Commerce should consider factors other than price in determining whether to disregard related-party sales).  The Court, therefore, affirms Commerce's determination to disregard related party sales.

5. Reallocation of United States Selling Expenses Based on Resale Price to the First Unrelated Party

NTN reported to Commerce the selling expenses it incurred in the United States, which were allocated on the basis of transfer prices from the manufacturer to its related U.S. subsidiary. Commerce reallocated the expenses based on the resale prices to the first unrelated purchasers because it determined that the resale

prices provided a more reliable measure of value.  <u>Final Results</u>, 61 Fed. Reg. at 66,515.

NTN argues that Commerce does not  provide any explanation for its decision to reallocate NTN's U.S. selling expenses.  According to NTN, Commerce's conclusion that prices to unrelated parties are more accurate than the transfer price is incorrect.  NTN acknowledges that this Court sustained Commerce's methodology in <u>NSK</u>, 21 CIT ___, 969 F. Supp. 34, but requests that the Court remand so that Commerce could recalculate NTN's margin based on NTN's data as reported.  NTN's Mem. Supp. J. Agency R. at 21-22. Torrington agrees with Commerce and asserts that this Court has already rejected NTN's argument.

The Court declines to revisit its rationale articulated in <u>NSK</u>, which held that Commerce's reallocation of selling expenses based on the sales price to the first unrelated purchaser is reasonable.  Accordingly, the Court affirms Commerce's method of calculating NTN's margin using resale prices and not transfer prices.

<u>Conclusion</u>

The case is remanded for Commerce to: (1) review the record to determine whether it is possible to isolate and remove the portions of Koyo's warranty expenses which relate to non-scope merchandise

from the adjustments to FMV or, in the alternative, to deny the adjustment if such an apportionment cannot be made; and (2) exclude any sample transactions unsupported by consideration from the calculation for NTN's FMV.  Commerce is affirmed in all other respects.

_____

NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated: July 29, 1999
      New York, New York